## SCHAFFER TRANSPORTATION CO. ET AL. *v.* UNITED STATES ET AL.

No. 20.   Argued November 13, 1957.—Decided December 9, 1957.

*Peter T. Beardsley* argued the cause and filed a brief for appellants.

*Charles H. Weston* argued the cause for the United States, appellee. With him on the brief were *Solicitor General Rankin* and *Assistant Attorney General Hansen.*

*H. Neil Garson* argued the cause for the Interstate Commerce Commission, appellee. With him on the brief was *Robert W. Ginnane.*

*Amos Mathews* argued the cause for the Akron, Canton & Youngstown Railroad Co. et al., appellees. With him on the brief were *J. D. Feeney, Jr., Joseph H. Hays, H. F. Chapman, Carl Helmetag, Jr., James G. Lane* and *Ed White.*

*John S. Burchmore* and *Robert N. Burchmore* filed a brief for the National Industrial Traffic League, as *amicus curiae.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The issue in this case is whether the Interstate Commerce Commission adequately and correctly applied the

standards of the National Transportation Policy in denying a motor carrier's application to provide service between points now served exclusively by rail. The applicant, A. W. Schaffer, a common carrier by motor doing business as Schaffer Transportation Co., holds a certificate of public convenience and necessity authorizing him to transport granite from Grant County, South Dakota, to points in 15 States. In the present application he sought additional authority under § 207 (a) of the Motor Carrier Act of 1935, as amended by the Transportation Act of 1940,[1] to transport granite from Grant County to various new points as well as authority to transport from points in Vermont to several States in the Midwest and South.[2] From all that appears in the Commission's report, rail service is currently the only mode of transportation available to shippers of granite between the points sought to be served by Schaffer.

The evidence adduced to demonstrate the need for Schaffer's service came from three shippers, six receivers

---

[1] 49 Stat. 551, as amended, 54 Stat. 923, 49 U. S. C. § 307 (a). Section 207 (a) of the Act provides:

"(a) Subject to section 210, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this part and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied . . . ."

[2] A portion of the requested East-bound authority was opposed by a motor carrier already certificated to serve points in five of the Eastern States. This portion of the requested authority was denied by Division 5 of the Commission and is no longer in issue as Schaffer did not seek reconsideration. With this exception, the requested authority was opposed solely by railroads which presently serve the points involved.

and an association composed primarily of Vermont manufacturers of finished granite products. Their evidence, as summarized in the report of Division 5 of the Commission, disclosed the following advantages to be gained from motor carrier service: [3]

> "They all agree that [existing rail] service, in the main, is satisfactory for the transportation of carload shipments but entirely inadequate for the transportation of less-than-carload shipments, not only from the standpoint of cost, but also and primarily from a service standpoint. In this respect, the record shows that on movements of small shipments the supporting witnesses have experienced delays, damage to their merchandise, and have been hampered to some degree by the lack or insufficiency of rail sidings. In many instances, they have been asked by customers to furnish delivery by motor carrier but because of the lack of such service they have been unable to comply with these requests. Moreover, and no less important from a business point of view, the shippers are faced with the competitive disadvantage of having to compete with producers of granite at other locations which have truck delivery available. Then, too, the lack of truck service has impeded shippers' ability to increase their sales and expand their markets in this area. By use of the proposed service, certain other benefits also would accrue to the shippers or dealers. For example, the latter would be able to maintain lower inventories, receive their freight faster and more frequently, and thus, be able better to meet erection deadlines,

---

[3] Whether these advantages demonstrate that the public convenience and necessity required Schaffer's proposed service is not for us to say. We take note of them only to indicate that *some* showing of need was established.

especially during the peak seasons. Furthermore, the amount of crating now necessary would be reduced with resultant savings in time and money."

Relying on these factors, Division 5 approved the application, but the full Commission reconsidered the application on the same record, and, with four Commissioners dissenting, ordered it denied. *A. W. Schaffer Extension—Granite,* 63 M. C. C. 247. Schaffer brought an action before a statutory three-judge court under 49 U. S. C. § 305 (g) to set the order aside. The District Court denied relief and ordered the complaint dismissed. 139 F. Supp. 444. The case is here on direct appeal.[4] 28 U. S. C. §§ 1253, 2101 (b). We noted probable jurisdiction. 352 U. S. 923.

The National Transportation Policy,[5] formulated by Congress, specifies in its terms that it is to govern the

---

[4] The American Trucking Associations, Inc., was a plaintiff below and is an appellant here. The United States supported the ICC's order in the District Court but has since concluded "on further analysis" that the order is erroneous; the United States therefore opposed in this Court the Commission's motion to affirm and both filed a brief and presented oral argument in support of appellants. Fifty-four railroads, presently serving the areas for which Schaffer seeks operating authority, appear as appellees along with the Commission.

[5] "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs

Commission in the administration and enforcement of all provisions of the Act, and this Court has made it clear that this policy is the yardstick by which the correctness of the Commission's actions will be measured. *Dixie Carriers, Inc.* v. *United States,* 351 U. S. 56; *Eastern-Central Motor Carriers Assn.* v. *United States,* 321 U. S. 194; *McLean Trucking Co.* v. *United States,* 321 U. S. 67. Of course, the Commission possesses a "wide range of discretionary authority" in determining whether the public interest warrants certification of any particular proposed service. *United States* v. *Detroit & Cleveland Navigation Co.,* 326 U. S. 236, 241; *Interstate Commerce Commission* v. *Parker,* 326 U. S. 60. But that discretion must be exercised in conformity with the declared policies of the Congress. To see whether those policies have been implemented we look to the Commission's own summary of the evidence, and particularly to the findings, formal or otherwise, which the Commission has made. Just as we would overstep our duty by undertaking to evaluate the evidence according to our own notions of the public interest, we would shirk our duty were we summarily to approve the Commission's evaluation of the record without determining that the agency's evaluation had been made in accordance with the mandate of Congress.

The Commission denied Schaffer's application on the following basis:

> "On the foregoing facts, we are unable to conclude that the public convenience and necessity require the proposed operation. It is seen that for one reason or another the supporting witnesses find fault with the presently utilized rail service. Actually, however,

---

of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." 54 Stat. 899, 49 U. S. C. preceding § 1.

the evidence warrants the conclusion that the witnesses are reasonably satisfied with rail service except for the one complaint that all share, namely, that rail service is too slow. Nevertheless, it is the practice for the Vermont shippers to hold finished granite until they can accumulate a pool-car load in order that the shipments may move at the lower pool-car rate. This practice is followed with the knowledge and consent of the consignees, and the sole purpose therein is to take advantage of the lower rail rate. Less-than-carload rail service, while not as expeditious as the proposed service, is fairly good, but because of the higher rate involved this service is seldom used by the supporting witnesses. The testimony of the South Dakota shipper also indicates that its support of the application is largely motivated by anticipated cheaper transportation.

"We have carefully considered applicant's arguments to the contrary, but are forced to conclude that the service presently available is reasonably adequate. The evidence indicates that the witnesses' main purpose in supporting the application is to obtain lower rates rather than improved service. It is well established that this is not a proper basis for a grant of authority, and the application, therefore, must be denied."

Viewing these conclusions in light of the National Transportation Policy we find at the outset that there has been no evaluation made of the "inherent advantages" of the motor service proposed by the applicant. That policy requires the Commission to administer the Act so as to "recognize and preserve the inherent advantages" of each mode of transportation. *Dixie Carriers, Inc.* v. *United States, supra; Interstate Commerce Commission* v. *Mechling,* 330 U. S. 567. When a motor carrier seeks to offer service where only rail transportation is presently

authorized, the inherent advantages of the proposed service are a critical factor which the Commission must assess. How significant these advantages are in a given factual context and what need exists for a service that can supply these advantages are considerations for the Commission.

Rather than evaluate the benefit that Schaffer's proposed motor service might bring to the public, the Commission cast its first principal conclusion in terms of the adequacy of existing rail service, finding that service to be "reasonably adequate." Yet the Commission itself has previously stated: "That a particular point has adequate rail service is not a sufficient reason for denial of a certificate [to a motor carrier]." *Bowles Common Carrier Application,* 1 M. C. C. 589, 591. Of course, adequacy of rail service is a relevant consideration, but as the Commission recognized in *Metler Extension—Crude Sulphur,* 62 M. C. C. 143, 148, "relative or comparative adequacy" of the existing service is the significant consideration when the interests of competition are being reconciled with the policy of maintaining a sound transportation system. The record here does not disclose the factors the Commission compared in concluding that existing rail service is "reasonably adequate." For example, the Commission has not determined whether there are benefits that motor service would provide which are not now being provided by the rail carriers, whether certification of a motor carrier would be "unduly prejudicial" [6] to the existing carriers, and whether on balance the public interest would be better served by additional competitive service. To reject a motor carrier's application on the bare conclusion that existing rail service can move the

---

[6] *Interstate Commerce Commission* v. *Parker,* 326 U. S. 60, 70.

The Commission did not purport to rely on any evidence indicating what revenue the railroads might lose by certification of the applicant.

available traffic, without regard to the inherent advantages of the proposed service, would give one mode of transportation unwarranted protection from competition from others. As the report of Division 5 emphasizes, "[N]o carrier is entitled to protection from competition in the continuance of a service that fails to meet a public need, nor, by the same token, should the public be deprived of a new and improved service because it may divert some traffic from other carriers."

The Commission's second basic conclusion from the record was that the main purpose of the witnesses in supporting the application was the prospect of obtaining lower rates. For this reason the Commission discounted the testimony of these witnesses, apparently without even evaluating the claimed advantages of the proposed service other than reduced rates. We think this approach runs counter to the National Transportation Policy. The ability of one mode of transportation to operate with a rate lower than competing types of transportation is precisely the sort of "inherent advantage" that the congressional policy requires the Commission to recognize. *Dixie Carriers, Inc.* v. *United States, supra.* The Commission asserts that it has always considered rates irrelevant in certification proceedings under § 207 (a), yet, with but one exception, it relies on administrative decisions involving applications by a carrier to provide service to an area already served by the same mode of transportation.[7]

---

[7] *Omaha & C. B. Ry. & Bridge Co. Common Carrier Application,* 52 M. C. C. 207, 234–235; *Pomprowitz Extension—Packing House Products,* 51 M. C. C. 343, 347–348; *Black Extension of Operations—Prefabricated Houses,* 48 M. C. C. 695, 708–709; *Johnson Common Carrier Application,* 18 M. C. C. 194, 195–196; *Wellspeak Common Carrier Application,* 1 M. C. C. 712, 714.

In the one exception, *Youngblood Extension of Operations—Canton, N. C.,* 8 M. C. C. 193, the motor carrier's application was opposed by other motor carriers.

Those decisions are entirely different from the situation presented here, where a motor carrier seeks to compete for traffic now handled exclusively by rail service. In these circumstances a rate benefit attributable to differences between the two modes of transportation is an "inherent advantage" of the competing type of carrier and cannot be ignored by the Commission.

Since the Commission has failed to evaluate the benefits that Schaffer's proposed service would provide the public, including whatever benefit may be determined to exist from the standpoint of rates, and since the findings as to the adequacy of rail service do not provide this Court with a basis for determining whether the Commission's decision comports with the National Transportation Policy, that decision must be set aside, and the Commission must proceed further in light of what we have said.

We do not minimize the complexity of the task the Commission faces in evaluating and balancing the numerous considerations that collectively determine where the public interest lies in a particular situation. And we do not suggest that the National Transportation Policy is a set of self-executing principles that inevitably point the way to a clear result in each case. On the contrary, those principles overlap and may conflict, and, where this occurs, resolution is the task of the agency that is expert in the field. But there is here no indication in the Commission's findings of a conflict of policies. Shippers and receivers now served exclusively by rail have testified to the advantages they would gain from a proposed motor carrier service. There is no finding that the authorization of the proposed service would impair the sound operation of the carriers already certificated. Nor has the Commission properly evaluated the advantages urged by the supporting witnesses to determine whether the standard of public convenience and necessity has been met.

For the foregoing reasons, the judgment is reversed and the cause is remanded to the District Court with directions to set aside the Commission's order and remand the cause to the Commission for further proceedings in conformity with this opinion.

*It is so ordered.*

MR. JUSTICE FRANKFURTER.

The Transportation Act of 1940 (amending the Interstate Commerce Act) grants to the Interstate Commerce Commission powers and imposes limitations upon their exercise in terms of greatly varying degrees of definiteness. As a consequence, the range of discretion left to the Commission and, correspondingly, the scope of judicial review of Commission orders greatly vary. Thus, our decision this day in Nos. 6 and 8, *American Trucking Associations* v. *United States, post,* p. 141, is a striking illustration of the difference between the limitation to which the Commission is subjected in a proceeding under § 5 (2)(b) of the Interstate Commerce Act, 24 Stat. 379, as amended, 49 U. S. C. § 5 (2)(b), and the requirements of § 207 of that Act, as amended by 49 Stat. 551, 49 U. S. C. § 307, although both relate to motor carrier service by railroads. The Commission's power to grant relief under the undefined terms of the long-and-short-haul clause of § 4 of that Act, as amended by the Mann-Elkins Act of June 18, 1910, 36 Stat. 539, 547, see *Intermountain Rate Cases,* 234 U. S. 476, was modified by the specific requirements which Congress wrote into the long-and-short-haul clause in § 6 of the Transportation Act of 1940, 54 Stat. 904, 49 U. S. C. § 4 (1). In short, some rules dealing with the regulation of surface transportation are narrowly specific, leaving practically no scope for discretion in their application by the Interstate Commerce Commission. Other provisions are expressed

in terms which necessarily leave considerable scope in the evaluation of their implied ingredients, while still others are of such breadth as to leave even wider opportunity for an exercise of judgment by the Commission not to be displaced by a court's independent judgment under the guise of judicial review.

In the case before us, the Interstate Commerce Commission denied an application for a certificate of public convenience and necessity under § 207 (a) of the Interstate Commerce Act, as amended. On review of this denial, the three-judge District Court sustained the Commission. This Court reverses the District Court on the ground that the Commission has failed to enforce the National Transportation Policy in § 1 of the Transportation Act of 1940, 54 Stat. 899, 49 U. S. C., at p. 7107. The very name of these introductory recitals to the Transportation Act illumines their legal significance: "All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." Congress thus conveyed to the Commission a most generalized point of view for carrying out its manifold, complicated and frequently elusive duties. In the very nature of things this Policy is unlike a more or less specific rule affording more or less defined criteria for application in a particular case. Still less does it afford concrete, definable criteria for judicial overturning of the Commission's conscientious attempt to translate such Policy into concreteness in a particular case.

No doubt the Commission is under obligation to heed what was declared to be "the national transportation policy of the Congress," namely, "to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each." Surely these are not mechanical or self-defining standards. They inevitably imply the widest areas for judg-

ment to be exercised, as the Commission has sought to exercise it, with the massive experience which must be attributed to it in this particular case. It is because I find myself regretfully in disagreement with my brethren regarding the nature and scope of the problem of judicial review in a case like this that I would affirm the judgment of the District Court.

It is, however, pertinent to add that the Court's decision may serve a useful purpose if it will lead the Interstate Commerce Commission, despite its enormous volume of business, to a more detailed and illuminating formulation of the reasons for the judgment that it reaches even in that class of cases where Congress has relied on the Commission's discretion in enforcing the most broadly expressed congressional policy. Since the orders in such cases also fall under judicial scrutiny, it is desirable to insist upon precision in the findings and the reasons for the Commission's action.