**SOUTHERN RAILWAY COMPANY and Georgia Southern & Florida Railway Company, Plaintiffs,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. A. No. 1462.**

United States District Court
Middle District Georgia.

Sept. 22, 1958.

---

B. Franklin Taylor, Jr., Asst. General Counsel, Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

Charles J. Bloch, Macon, Ga., Henry J. Karison, Washington, D. C., R. Granville Curry, Washington, D. C., for Southern Ry. Co.

R. B. Gwathmey, Wilmington, N. C., Clarence Raymond, Louisville, Ky., for intervening defendants.

Walter C. Scott, Jr., Savannah, Ga., William C. Turpin, Macon, Ga., Hitch, Miller & Beckmann, Savannah, Ga., Frank O. Evans, U. S. Atty., Macon, Ga., for United States of America.

Before TUTTLE, Circuit Judge, and DAVIS and BOOTLE, District Judges.

PER CURIAM.

This is a proceeding by the Southern Railway Company to have set aside the report and order of the Interstate Commerce Commission in Docket No. I. & S. 6538, Routing, Coal, Louisville & Nashville Railroad and Nashville, Chattanooga & St. Louis Railway to Georgia Southern and Florida Railway, requiring the cancellation of certain tariffs wherein Southern Railway Company and its subsidiary, Georgia Southern & Florida Railway Company, proposed to eliminate the participation of certain routes embracing intermediate carriers between Atlanta and Macon or Cordele, Georgia, in the lowest competitive joint rates on coal moving from origin mines on the Louisville & Nashville Railroad Company and the Nashville, Chattanooga & St. Louis Railway Company to stations on the Georgia Southern & Florida Railway north of the Jacksonville-Chattahoochee, Florida, line of the Seaboard Air Line Railroad Company. The report of the Commission (Division 2) may be found at 300 I.C.C. 125.

For many years there has been in effect a joint rate on coal originating on the lines of the L. & N. and N. C. & St. L. (hereinafter sometimes collectively called L. & N.) and the several roads covering the following four routes:

(1) Louisville & Nashville to Atlanta; Southern to Macon; Georgia Southern to destination.

(2) Louisville & Nashville to Atlanta; Georgia Railroad to Macon; Georgia Southern to destination.

(3) Louisville & Nashville to Atlanta; Central of Georgia to Macon; Georgia Southern to destination.

(4) Louisville & Nashville to Atlanta; Atlantic Coast Line to Cordele; Georgia Southern to destination.

The Georgia Southern is a subsidiary of the Southern Railway Company and is operated as an integral part of the Southern system. Thus, in each of the above routes, final delivery is made by the Southern.

The Commission made findings to the effect that, from the common gateway, Atlanta, the distances to Warner Robins, Georgia, called by the Commission in its brief here, "a representative destination" are for the several numbered routes: (1) 104 miles; (2) 219 miles; (3) 119 miles; (4) 220 miles. Each of them requires an interchange of cars at Atlanta, and each of them, except No. (1), requires a second interchange at Macon in routes (2) and (3), and at Cordele in route (4). In the case of No. (4), Coast Line from Atlanta and Georgia Southern to Warner Robins, there is a back-haul of approximately 48 miles.

Seeking to eliminate the joint rate as existing for all routes except the direct route, No. (1), and thus obtaining for itself the maximum haul without effective competition, the Southern filed with the Commission schedules proposing to eliminate the joint rates. The Commission ordered a suspension of the proposed schedules, and the hearings resulting in the challenged order follow. The L. & N. and all other affected carriers intervened in opposition to the Southern.

The following statement of facts is taken from the Report of the Commission:

"The principal movement of coal in 1955 from these mines over the above routes was to Warner Robins, Ga., where an Air Force base is located. This base is on the Georgia Southern 16 miles south of Macon and 48.5 miles north of Cordele. The respondents compare the short-line distances from Atlanta to Warner Robins, 104 miles, with distances over routes involving the Central of Georgia, the Georgia Railroad, and the Coast Line, 119, 219, and 220 miles, respectively. Using Windrock, Tenn., a point in Louisville & Nashville mine group 1, as representative, the short-line distance therefrom to Atlanta, thence the Southern to Warner Robins, is 335 miles, as compared with 352, 452, and 453 miles, respectively, from the same origin over routes beyond Atlanta of the Central of Georgia, the Georgia Railroad, and the Coast Line, respectively, to the same destination. The latter routes are 5.1, 34.9, and 35.2 percent longer than the short-line route over the Southern, and do not appear to be unduly circuitous.

"A traffic study of coal moved from mines on the Louisville & Nashville and the Nashville, Chattanooga & St. Louis over these routes to Warner Robins and other stations on the Georgia Southern in 1955, disclosed that 2,030 carloads originated at mines on the Louisville & Nashville, and 12 carloads at mines on the Nashville, Chattanooga & St. Louis. All of the latter shipments moved to Warner Robins, 1 over the Central of Georgia route and 11 over the Georgia Railroad route. Of the 2,030 carloads from mines on the Louisville & Nashville, 524 moved to Warner Robins, of which 219 (41.8 percent), 114 (21.7 percent), 117 (22.3 percent), and 74 (14.2 percent) moved from Atlanta over the Southern, the Central of Georgia, the Georgia Railroad, and the Coast Line, respectively. Of the remaining 1,506 carloads, 1,485 (98.6 percent), 4 (0.4 percent), 1 (0.07 percent), and 16 (1.06 percent) moved over the Southern, the Central of Georgia, the Georgia Rail-

road, and the Coast Line, respectively. It thus appears that the great bulk of this traffic, except to Warner Robins, moved over the more direct route of the Southern, and that to Warner Robins somewhat less than half of the shipments moved over that route.

"A witness for the Harlan County Coal Operators Association, whose members own mines in Harlan and Bell Counties, Ky., served by the Louisville & Nashville, testified that the bulk of the coal traffic of its members to these stations on the Georgia Southern, other than Warner Robins, moves over the direct route of the Southern from Atlanta through Macon. Because of the mountainous terrain in which these mines are located, the tracks of each are long enough to accommodate only 1 day's supply of empty and loaded cars. These operators are dependent upon a continuous car supply and *prefer not* to have to rely upon one railroad beyond the originating carrier's junction as a source of empty-car supply. Thus, these mines, being generally served by a single originating carrier, *urge* that they would be placed at a serious disadvantage in the absence of alternate routes beyond such junction, and would risk *possible* delays in the delivery of loaded cars, and the return of empties. A witness for the Penn-Dixie Cement Corporation, located at Clinchfield, Ga., a point midway between Macon and Cordele, and a receiver of large quantities of coal used in the manufacture of cement, stated that in 1955 some 1,400 carloads of coal moved to its plant mainly from mines on the Louisville & Nashville, and mostly over the direct route of the Southern from Atlanta. *Both witnesses admitted that the service over the latter route was adequate and satisfactory,* but they are *opposed* to the routing restrictions mainly on the ground that they

*might be* handicapped at times in moving their traffic *if* dependent upon a single route. They *ask* that all these routes be continued as a guard against delays caused by landslides, washouts, derailments, strikes, or other *contingencies* which *might* interfere with their daily empty-car or coal supply. No one connected with the Air Force base at Warner Robins protested or appeared in opposition to the proposed restrictive routing. [Emphasis added.]

\* \* \* \* \* \*

"In 1955, the Georgia Railroad interchanged at Macon a total of 2,-142 carloads. Of this total, 576 carloads, or 26.9 percent, constituted traffic handled in connection with the Georgia Southern, of which 122 cars or 5.7 percent, contained coal. The Georgia Railroad enters Macon over a branch line diverging from its main line at Camak, Ga., which is called the Macon division. This division is 78 miles in length, and constitutes about 25 percent of the total mileage of the Georgia Railroad. In 1954, that division contributed 10.66 percent of the total revenue earned by the carrier, and is characterized as a marginal operation. The Georgia Railroad and the Louisville & Nashville maintain joint terminal facilities at Atlanta so as to enable both to handle efficiently and economically traffic interchanged between them. Coal traffic from mines on the Louisville & Nashville destined to points beyond Atlanta was a persuasive factor in projecting those facilities. See Coal and Coal Briquets in the South, 289 I.C.C. 341, 362–363. [Presumably to other points as well as those on the Georgia Southern.]

"The Coast Line *urges* that the elimination of its route from Atlanta through Cordele to destinations on the Georgia Southern on this traffic would increase the cost of maintain-

ing the service and impair its ability to continue to provide such service in the future. [Emphasis added]

\* \* \* \* \* \*

"As indicated, the Southern handled in 1955 from Atlanta practically all of the traffic here concerned, destined to points on the Georgia Southern, except to the Warner Robins Air Force base, and to that point it handled 41.8 percent, the remaining 58.2 percent having been divided among the 3 protestant bridge lines. As stated, the shipper witnesses indicated that the route of the Southern from Atlanta is satisfactory to them. It is thus reasonably certain that the great bulk of their traffic would continue to move over the Southern if the present routes were continued."

The examiner made his findings and report recommending approval of the proposed schedules. The Commission Division No. 2 sustained intervenors' exceptions to the examiner's report and entered its order cancelling the schedule, one member dissenting. Upon petition for reconsideration, the entire Commission entered its order denying the petition.

Inasmuch as our disposition of the case is based on the nature of the findings and conclusions of the Commission we deem it important to quote them in full:

"While no representative appeared at the hearing in behalf of the Warner Robins Air Force base, section 6(8) of the Interstate Commerce Act provides that in time of war or threatened war carriers shall adopt every means within their control to facilitate and expedite military traffic, and in time of peace that deliveries of Government traffic to agents of the United States shall be made as promptly as possible. Thus, whether in time of war or peace, every reasonable effort must be made to expedite the transportation of traffic consigned to agents of the United States, and this includes traffic to the Air Force base at Warner Robins. Under the national transportation policy, the Commission is charged with the duty of promoting adequate, economical, and efficient service, and of fostering sound economic conditions in transportation and among the several carriers, to the end of developing, coordinating, and preserving a national transportation system adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense.

"Section 15(3) of the act provides that in instances where through routes or joint rates are canceled without the consent of all carriers parties thereto or authorization by the Commission, and are suspended for investigation, the burden of proof is upon the carriers proposing the cancellation to show that it is consistent with the public interest, without regard to the short-hauling or other provisions of section 15(4). The only reason given by the respondents for the proposed restrictive routing is to protect their long haul, to eliminate the bridge lines which they urge involve circuitous and time-consuming transportation, and to channel the traffic to what they believe to be a more efficient and economical route.

"As stated, the bridge routes sought to be eliminated are not unduly circuitous, and the shipper testimony before us is in favor of continuing those routes. Considering our duties under the national transportation policy to maintain a transportation system adequate to meet the needs of commerce generally and of the national defense, we are not satisfied that the respondents have met the burden resting upon them of showing that the cancellation of the bridge routes proposed would be consistent with the public interest.

\* \* \* \* \* \*

" \* \* \* We find that the proposed cancellation of joint rates and

routes is not shown to be just and reasonable."

Thus, it is clear that the Commission based its decision that the cancellation of the bridge routes would not be consistent with the public interest on three propositions: (1) the routes identified above as (2), (3) and (4) are not unduly circuitous; (2) shipper testimony is in favor of continuing those routes; and (3) the needs of commerce generally and of the national defense require the maintenance of the status quo.

■■ There should not, at this late date, be much dispute over the scope of the court's review of actions of the Interstate Commerce Commission. Undoubtedly the Interstate Commerce Act charges the Commission with the duty of promoting "adequate, economical, and efficient service, and of fostering sound economic conditions in transportation." It is also obvious that some of these requirements may be mutually inconsistent in particular situations. For example a sound economic condition in transportation may require a balance between the wasteful duplication of facilities and services on the one hand and the need for healthy competition on the other. The balancing of these demands is, we think, peculiarly within the jurisdiction of the Commission. Thus, in addition to the usual injunction that the courts must not upset factual determinations of administrative tribunals, if supported by adequate findings of fact based on substantial evidence from the record as a whole, we are here required to recognize that there are also certain quasi policy determinations that are inviolate insofar as they are shown to be made within the framework of the law and on an adequate factual basis.[1]

Plaintiff here contends that the Commission's order is erroneous because it is clearly based on an improper construction of Section 6(8) of the Interstate Commerce Act,[2] whose application to the proven facts here vitiate the conclusions, and that, aside from the national defense ground, the Commission's conclusions are not based on specific findings having adequate support in the evidence.

The Commission replies that the reference in the order to Section 6(8) is illustrative only and is not made the basis of the holding, and even if "inappropriate," this would be no basis for setting the order aside. It further argues that "all required findings were made and that its conclusion is a natural one."

We conclude that on the present record the decision of the Commission cannot stand. It is not fruitful to belabor the question whether the percentage of circuity of the bridge routes is to be determined by taking the straight line (Southern route) distance between the gateway at Atlanta to destination or by taking into consideration the added distance over the L. & N. before the coal is delivered to one or the other of the indicated routes. It stands without possibility of contradiction that as to two of the bridge routes, Nos. (2) and (4), the distance from the interchange at Atlanta to the selected destination is more

---

1. For a discussion of the scope of review in different situations see Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308; Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 54 S.Ct. 692, 78 L.Ed. 1260; Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; East Texas Motor Freight v. Frozen Food Express, 351 U.S. 49, 54, 76 S.Ct. 574, 100 L.Ed. 917; Schaffer Transportation Co. v. United States, 355 U.S. 83, 88, 78 S.Ct. 173, 2 L.Ed.2d 117.

2. "Preference to shipments for United States. In time of war or threatened war preference and precedence shall, upon demand of the President of the United States, be given, over all other traffic, for the transportation of troops and material of war, and carriers shall adopt every means within their control to facilitate and expedite the military traffic. And in time of peace shipments consigned to agents of the United States for its use shall be delivered by the carriers as promptly as possible and without regard to any embargo that may have been declared, and no such embargo shall apply to shipments so consigned." 49 U.S.C.A. § 6(8).

than twice as long as the shortest route—219 and 220 to 104, respectively. It is also undisputed that such routes involve an additional interchange to the Southern either at Macon or at Cordele. A strong case was made in the record that this amount of "circuity" was uneconomical. It can hardly be questioned that in the classical economic sense there is a waste or loss in the extra haulage involved in carrying any commodity twice as far as is necessary. The record here discloses without dispute that this economic loss is also a practical one. It is, of course, a loss which in the long run must ultimately be borne by the public, and it is thus one which it is the duty of the Commission to seek to avoid, unless there are countervailing considerations.

■ Use of the words "economical" and "economic" in the National Transportation Policy clearly demonstrates the intent of Congress that one of the primary concerns of Congress is to have the Commission give serious attention to the matter of providing economical transportation; that is, transportation at as low rates to the public as may be consistent with the other requirements of the Policy. We think it not amiss to note that following a special report of a subcommittee on Surface Transportation of the Senate Committee on Interstate and Foreign Commerce, and a special message from the Secretary of Commerce, Congress, at the session just ended, passed legislation to make funds available to the railroads. 72 Stat. 568, 1958 U.S.Code Congressional and Administrative News, p. 2969. The whole import of this legislation is that funds for the development of needed facilities for the railroads are not available at current interest rates or in the capital market from ordinary commercial sources. A significant comment appears in the subcommittee report which is part of the legislative history of this amendment to the Interstate Commerce Act:

"The railroad industry has not, in the subcommittee's opinion been sufficiently interested in self-help in such matters as * * * abolishing of unnecessarily circuitous routes for freight movements."

■ Wasteful operation, regardless of what particular carrier suffers the economic loss temporarily, is one of the things to be avoided if the elimination of the wasteful procedure does not run counter to other mandates of the Act.

■ We think, therefore, that on this affirmative showing the Southern clearly carried the initial burden of proving that the cancellation of the two bridge routes (2) and (4) was just and reasonable and consistent with the public interest. But, as we have said, it is the Commission's duty to weigh and adjust conflicting interests. Among the considerations which it might properly weigh to counteract the prima facie case made by the plaintiff are: the need for competing lines in this particular traffic; the need for the interchanges between these carriers for continued efficient transportation of this traffic or in general; the effect on such interchange and on the economic position of the other carriers of the elimination of these joint routes for coal; the effect of such elimination on the carriers concerned in relation to their ability to furnish the adequate service if and when needed for the national defense.

The difficulty we have in reviewing the Commission's order here is that no basic findings are made as to any of these considerations. Whatever is said in the Commission's report bearing on these matters is stated merely as the contentions of the intervenors. (See the italicized portions of the quoted findings above.) There is no finding, for instance, that deprivation of the Georgia Railroad of the traffic it carries on this joint route will jeopardize either the maintenance of the interchange between that road and the Southern at Macon or the economic position of the road generally. There is no finding that this small amount of traffic in fact strengthens the Georgia Railroad (which may well be questioned in light of the length of the haul for the tariff received). So also with the Coast Line. So, too, with respect to the other

considerations, at least some of which must be put forward by the Commission to negative the otherwise established claim of the Southern for relief.

We think the reference to Section 6(8) in the Commission's order is inappropriate. This is true for two reasons. In the first place no findings of fact are made to bring this provision into play, such, for instance, as a finding of the existence of threatened war, or any request by the President, necessary to make applicable the first part of the section, or such as a finding that the joint routes are necessary to permit delivery "as promptly as possible" in time of peace. In the second place no findings of fact support the implied conclusion that the prompt delivery of shipments to the government's installations either in time of war or peace is dependent on the maintenance of *joint routes*, as distinguished from the maintenance of *joint facilities*. On the record, there seems not to be any suggestion that in time of emergency the expediting of shipments, under the terms of Section 6(8), would be affected in the least by whether joint tariffs were in effect.

The shipper testimony is not sufficient to amount to more than the usual wish of shippers to have as many competing lines available to them as possible. The Commission made no finding that the wishes of the two shipper witnesses were warranted by a single fact in the record. It merely stated the shipper's desires.

To the extent that the Commission's finding that the two longest routes "are not unduly circuitous" is intended to mean that they are not undesirable from an economic standpoint, the record does not support the conclusion, and such finding is clearly erroneous. As to the Central of Georgia route, we cannot say the same. The route is so little longer than that of the Southern that we cannot overrule the Commission's finding that as to that route the Southern failed to carry its burden of showing its elimination is consistent with the public interest.

The failure of the Commission to make findings of facts which could be considered as offsetting the clear proof of the wasteful circuity of routes (2) and (4) makes it impossible for us to determine whether it made the determination between conflicting interests, which determination it alone may make.

As said in Schaffer Transportation Co. v. United States, 355 U.S. 83 at page 88, 78 S.Ct. 173 at page 176:

"* * * But that discretion must be exercised in conformity with the declared policies of the Congress. To see whether those policies have been implemented we look to the Commission's own summary of the evidence, and particularly to the findings, formal or otherwise, which the Commission has made. Just as we would overstep our duty by undertaking to evaluate the evidence according to our own notions of the public interest, we would shirk our duty were we summarily to approve the Commission's evaluation of the record without determining that the agency's evaluation had been made in accordance with the mandate of Congress."

It is not within our province to give effect to a part of the suspended schedule and to cancel other parts of it. It is possible for the Commission so to shape its report and order as to permit the schedules to stand so far as they eliminate routes Nos. (2) and (4) but not No. (3). We do not even conclude that the Commission must do this. We do conclude that on the present record and findings the Commission could not legally conclude that the plaintiff had not carried its burden of showing that the elimination of routes (2) and (4) is consistent with the public interest.

The order of the Commission is set aside and the case is remanded to the Commission for further proceedings in conformity with this opinion.