197 So.2d 64

**RAILWAY EXPRESS AGENCY, INC.**

v.

**LOUISIANA PUBLIC SERVICE COMMIS-SION and John S. Hunt, Chairman, Nat B. Knight and Ernest S. Clements, Members.**

No. 48302.

March 27, 1967.

Joseph H. Kavanaugh, Baton Rouge, for defendant-appellant.

Murphy Moss, Lemle & Kelleher, New Orleans, for plaintiff-appellee.

SUMMERS, Justice.

During 1963 Railway Express Agency, Inc. (hereinafter called REA) filed an application with the Louisiana Public Service Commission for a certificate of public convenience and necessity and for authority to operate a public service express motor line over U.S. Highway 90 and/or Interstate Highway 10, from New Orleans to the Louisiana-Texas state line, serving 27 intermediate points and fourteen additional off-route points.

After several hearings at which numerous motor carriers of freight and other handlers

of cargo along the route appeared and protested, the application was denied. Following a rehearing the denial was affirmed. REA then instituted proceedings in the Nineteenth Judicial District Court contesting the Commission's order. When stipulations of fact were entered into at the trial, the court remanded the case to the Commission for further consideration in light of the additional evidence (La.R.S. 45:1194).

Upon further consideration, the Commission issued Order No. 9425 granting the authority applied for subject to the following restrictions:

"1. No individual shipment or combination of shipments from any one shipper tendered on the same date shall be accepted if it exceeds, in total, two hundred pounds. This restriction, however, shall not apply to seafoods, newspapers, or other perishable commodities.

"2. Not more than two schedules in each direction shall be operated in intrastate commerce in any one day.

"3. The rates to be charged for the transportation service herein authorized shall be no lower than the rates published in the General Express tariff, applicable statewide; and no special rates for services herein authorized shall be made which are lower than those which would apply on the same shipment in express service on other rates in the State of Louisiana."

REA sought to have the Commission remove the weight restriction; but, after further review, the Commission denied the request and reaffirmed its Order No. 9425.

The matter was referred back to the District Court; and after proceedings there, judgment was rendered on June 10, 1966 deleting the weight restriction from the Commission's order. Appeal to this court was perfected by the Commission.

The application in question here was represented by REA to be made necessary by the discontinuance on September 15, 1963, by order of the Interstate Commerce Commission, of Southern Pacific passenger trains Nos. 5 and 6. These trains had long operated on this route and transported REA's express shipments. It was REA's position that, by transporting express in its own vehicles, it could continue to perform the same intrastate express service over this route which it traditionally performed prior to the discontinuance of the trains. In the meantime, since 1963, REA has handled interstate express shipments over this identical route in its own vehicles under authority granted by the Interstate Commerce Commission.

The protestants view REA's application as an effort to transport general commodities without limitation by motor vehicle between the points in question. As such, they say, it will constitute an undue incursion into the business of the motor freight carriers, an already overcrowded field of transportation. Ample motor carrier service exists, according to the protestants, and any freight formerly moved by train can now be expeditiously handled by motor carriers and the Greyhound Bus Line.

On this appeal, the Commission contends that deleting the weight limitation or restriction would not merely involve the issuance of authority to substitute motor vehicles for the trains heretofore used by REA, but such a grant would amount to the issuance of a new and different certificate of public convenience and necessity. We understand this contention to mean that "express service" should be defined by the imposition of these restrictions, and without the restrictions the certificate applied for would authorize unlimited freight service. Further, the Commission asserts that the trial court committed error by substituting its judgment for that of the Commission.

The Interstate Commerce Commission ordered the discontinuance of Southern Pacific trains Nos. 5 and 6, one eastbound and one westbound, on September 15, 1963. Virtually all express moving on this route had been handled by these discontinued trains. The remaining Southern Pacific trains, Nos. 1 and 2 (the Sunset Limited), afforded little space for express and stopped at only two points, Lafayette and Lake Charles, between New Orleans and Texas. As a result 27 Louisiana communities on the route and fourteen others dependent on

the route express service were to be deprived of express service. I.C.C., however, has granted authority to REA to operate express service for interstate shipments with its own motor trucks without weight restrictions as a substitute for the discontinued rail service.

Presented for determination, then, is the question: Should the same substitute service be allowed for intrastate service, without restriction 1—the weight restriction imposed by the Commission? Restrictions 2 and 3 are no longer in question, the propriety of the weight restriction being the sole issue formed by the appeal and the contentions raised in brief. Indeed, restriction 3 concerning express tariffs was implicit in any grant under the application.

Approximately 210 offices are maintained by REA within the State of Louisiana. Goods, wares and merchandise of every description, both large and small, especially that requiring fast transportation and careful handling, are transported by its express service. Its traffic includes wearing apparel, seasonal department store traffic, currency and coin, jewelry, negotiable securities, valuable papers, fur, legal papers; such perishables as fish, oysters, clams, crabmeat, fresh meats, milk, cream, ice cream mix, dry ice, fruit, vegetables, cut flowers, nursery stock and water cress; automobile and implement parts; birds, bees, goldfish, game for conservation purposes, and live creatures of all descriptions;

corpses, blood, dated drugs, vaccines, macinery, machinery parts, merchandise, explosives, inflammables; ballots and election supplies, shipments for the Department of Welfare and other government agencies, some of which are of a confidential character.

REA is authorized to transact its express business on a nationwide scale, and it or its predecessors have furnished express service over the route in question for well over 100 years. Heretofore REA relied principally upon rail transportation for the conduct of its express business, but air and water transport are also used. Approximately 17,000 motor vehicles throughout the country are now in use both in terminal pickup and delivery service and in line-haul operations.

Motor vehicles which REA proposes to use on this route are especially equipped with fish racks to protect dry traffic handled in conjunction with shipments of iced seafood. Such things as vents for the livestock handled, specially designed locks and safes for storing coin, precious metals and valuables and other facilities are provided for the protection and security of property transported.

Drivers are trained and familiar with handling express traffic, such as the company's method of rendering care and protection to shipments of live animals, perishables and commodities requiring special messenger attention. Rules which the Com-

mission may impose on express traffic will be known to these drivers and applied by them. Necessary paper work and other details peculiar to express business can be handled by them. As they are elsewhere, they will be bonded and armed in keeping with the responsibility which attends the handling of money and valuable cargo.

We do not hesitate to conclude from this record that no other transportation facility has furnished the varied and unique service traditionally handled by REA over this route. Operating rights of other carriers would prevent their handling all of the classes of traffic moving in express service, and irregular and inadequate schedules and lack of equipment to handle special classes of traffic moving in express service would delay shipments and deny the public the service traditionally furnished by REA.

It is true, as protestants contend, that some of the traffic handled by REA can be handled by motor freight carriers, the Greyhound Bus Lines and the armored car service on this route. But no special point is made by bringing out this fact, for this condition has existed since motor freight lines, the bus and armored car services began, after REA and its predecessors had been in business for many years on this route. A limited area of overlap and competition has undeniably existed between REA and the various carriers involved here. But the existence of this overlap in service does not mean that any of the protesting carriers

have furnished or are now prepared to furnish the complete, general express service required by the public along this route and to which it is accustomed. And it is no defense to REA's present application to say that others will furnish the needed express service in the future.

For example, one of REA's witnesses was a wholesale jeweler and manufacturer of ecclesiastical goods located along the route at Crowley. He shipped to some 75 retail jewelers located in many towns along the route. He testified that REA was the only carrier which could satisfactorily fulfill the requirements for the shipment of most jewelry and precious metals; parcel post limited the value of his insurable shipments to $200, and precious metals or precious stones were not accepted for shipment by motor freight carriers. Yet, he found motor freight most acceptable and less expensive for his bulkier and heavier shipments; indeed, he selected that mode of transport for those and other items when fast service or security of the cargo was not important.

A fact which we deem significant was brought out by this witness. In Crowley, he said, REA maintained an office and a reliable pickup and delivery service. We note that like offices are maintained by REA at the principal points it will serve on this route. These offices and their related pickup and delivery service are presently

functioning. The public requires them as an integral part of express service.

Ozio Fisheries and Hy Sanders, wholesale seafood dealers are located at Morgan City. Ozio Fisheries has used REA express almost daily for the past 38 years; and Sanders, too, has for many years used this service. Both use it for interstate and intrastate shipments of fresh fish under refrigeration. At least 12.4 percent of the shipments made by Ozio are in intrastate commerce, and if REA's service is discontinued he will have no one to transport his product. No motor freight carrier has solicited their business.

West Brothers is a department store chain with a number of stores along the route. During peak seasons they find it necessary to transfer merchandise from one store to another to meet customer needs. Many of its shipments are made by REA. In addition, depending upon its particular transportation problem, this company uses both motor freight and bus service. All are considered necessary to its business.

A pharmacist located at Franklin on the route found REA's reliability and ready adjustment of loss-in-transit-claims a factor in receiving or shipping drugs and pharmaceutical supplies.

The purchasing agent of J & L Engineering Company at Jeanerette testified. His company manufactures cane harvesters. It uses REA or motor freight carriers for shipping repair parts, depending upon the requirements of the individual shipment.

REA shows that it cannot contract with existing motor carriers to handle its express business, for there is no one carrier able and willing to perform all the services REA has rendered. Without the specially trained personnel, truck and office facilities necessary to the unique character of the service rendered by REA, the flexibility of the service offered is reduced, and the control required cannot be maintained. And unless the entire operation is coordinated with train operations, pickups and transfers at train stations cannot be adjusted to delayed or altered train schedules. Motor freight carriers are not geared to such a system.

Public officials, merchants and business men from cities along the route testified to the public need for REA's service. Evidence presented by REA concerning the public convenience and necessity dominated the hearings; whereas, evidence presented by the protestants consisted mainly of the testimony of representatives of their own companies who, in effect, outlined the service they were furnishing and voiced grave concern about the competition which would result to their operations by granting REA's application.

From the whole record, we conclude that REA has established that the public convenience and necessity requires the continuance of its traditional express service.

▮▮▮ Because competition has existed, will continue to exist, and will perhaps be intensified hereafter, a basis is not thereby furnished for imposing restrictions upon REA's express service to which it was not previously subject. The grant of a certificate to motor freight carriers does not carry with it the assurance that there will be no competition with that mode of transport service.

The national average weight of express shipments is only 50 pounds, and most of the shipments moving over the route in question are small and light.

In Freight, All Kinds, L.C.L., Container Charges—U.S.A., 323 I.C.C. 468 (1964) the Interstate Commerce Commission pointed out that REA's principal traffic consists of small shipments averaging about 50 pounds and that approximately 93 percent of the total number of shipments weigh 100 pounds or less. Nevertheless, REA's general commodity authority has always included virtually any type, size and weight of shipment. Removal of the weight restriction is therefore necessary if REA is to perform its traditionally complete express service. Deletion of the weight restriction will not result in ruinous competition with the motor freight carriers.

It should be apparent to all, as it is to us, that a weight restriction will prove difficult of enforcement and unjust. REA's vehicles do not carry scales. Drivers who accept shipments throughout the State, which will move along the route in question, must unwittingly but inevitably violate the weight limitation. Shipments picked up by truck and which are found at the REA office to be overweight would have to be returned. When different drivers pick up several shipments on the same day from the same shipper and the aggregate of the shipments exceeds 200 pounds, a violation would again occur.

Noticeable injustices would result to the public along this route from the weight restriction. Shipments weighing in excess of 200 pounds could be handled by REA throughout the State, except when they move along U.S. Highway 90 where the discriminating limitation would be in effect.

In Railway Express Agency, Incorporated, Extension—Traverse City, Mich., 96 M.C.C. 727, 728 (1965), where a 500 pound restriction was suggested, the I.C.C. ruled:

"The Commission is always reluctant to impose restrictions in grants of operating authority administratively undesirable or difficult to enforce. The instant restriction imposed by the board in its recommended grant has both of these characteristics, and we perceive no useful purpose in retaining such a restriction on the authority granted."

More importantly, there is no evidence to support the imposition of the 200 pound weight restriction here. It is apparently a device employed by the Commission to de-

fine "express service" in the hope that it would thereby confine REA's operations to light shipments and thus bestow some measure of protection on the motor freight lines, the bus and armored car services. But the definition of "express" is more difficult to articulate. In Railway Exp. Agency, Inc., Extension—Nashua, N.H., 91 M.C.C. 311 (1962) this proposition was inferentially recognized. Furthermore, the wisdom or desirability of attempts to define express service in terms of a definite weight limit has been repeatedly denied. Freight, All Kinds, L.C.L., Container Charges—U.S.A., 323 I.C.C. 468 (1964). See also Railway Express Agency, Incorporated, Extension— Between Chicago and Cincinnati, 98 M.C.C. 92 (1965); New York Central Transport Company—Petition for Modification of Key Point Restrictions—Systemwide, 89 M.C.C. 389 (1962).

▬▬▬ This action of the Commission imposing the weight restriction, we feel, was taken without proper regard for the needs of shippers and receivers, who are the general public and whose interests are paramount here. Milne Truck Line, Inc. v. Public Service Commission, 9 Utah 2d 28, 337 P.2d 412 (1959). A sound and balanced transportation system on the route requires maintenance of the inherent value of REA's express service. The adverse effects which might result to protestants from competition must be reconciled with this need. Schaffer Transportation Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957).

Though express service has consistently been difficult to define, we are satisfied that this record reflects a cleavage between that service and motor freight and other cargo transportation services on the route. Premium tariffs of express service is one factor which will assure the division; the diversity of cargo REA can handle, the special attention given shipments, security, speed of handling, trained personnel and special facilities used are others.

Continuance of REA's express service with its own line-haul motor vehicles, without the 200 pound weight restriction, should not result in inordinate inroads by that service into the motor freight field; and, what is more important, the shippers and receivers of goods will not be deprived of a service for which a clear and apparent public need has been demonstrated.

For the reasons assigned, the judgment of the Nineteenth Judicial District Court is affirmed.