The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Chicago, Milwaukee, St. Paul and Pacific Railroad Company, Great Northern Railway Company, Northern Pacific Railway Company, Southern Pacific Company, Spokane, Portland and Seattle Railway Company, Union Pacific Railroad Company, and Western Pacific Railroad Company, Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

Sea-Land Service, Inc., Intervening Defendant.

No. 67 C 1654.

United States District Court
N. D. Illinois, E. D.

June 19, 1969.

James E. Nisbet and Ed White, Chicago, Ill., Jeremiah C. Waterman, Washington, D. C., for plaintiffs.

Thomas A. Foran, U. S. Atty., Chicago, Ill., Barry Roberts and Jerome Nelson, Interstate Commerce Commission, Washington, D. C., for defendants.

Warren Price, Jr., Washington, D. C., Harold E. Spencer, Chicago, Ill., H. H. Shull, Jr., Elizabeth, N. J., for intervening defendant.

Before SWYGERT, Circuit Judge, and PERRY and NAPOLI, District Judges.

## MEMORANDUM OPINION

PERRY, District Judge.

Sea-Land Service, Inc., (hereinafter "Sea-Land"), a common carrier of freight by water, transporting property between points in the United States, on December 28, 1964 filed its application (later amended) with the Interstate Commerce Commission seeking a certificate of public convenience and necessity authorizing the transportation, in interstate or foreign commerce, of general commodities, over regular routes—

(1) by self-propelled vessels, from Los Angeles Harbor, (including Long Beach) California, to Portland, Oregon, and Seattle and Vancouver, Washington;

(2) by self-propelled vessels, between San Francisco, Oakland, Alameda, and Richmond, California (called the "San Francisco Bay ports" by the Commission in its Report) and Stockton, California, on the one hand, and Portland, Seattle and Vancouver, on the other, and

(3) in containers, by non-self-propelled vessels with separate towing vessels, between the San Francisco Bay ports and Stockton, on the one hand, and Portland, Seattle, and Vancouver, on the other.

Sea-Land's application was opposed by each of the eight plaintiff railroads as well as by nine motor common carriers and four certificated water carriers. At the conclusion of the hearings and proceedings on the application, the Hearing Examiner filed his Report containing his findings of fact and conclusions recommending that an order be entered denying the application.

Applicant Sea-Land filed exceptions and on February 20, 1967, the Interstate Commerce Commission, by Division 1, (in its decision reported as Sea-Land Service, Inc., Extension-Pacific Coastwise, 329 I.C.C. 447) reversed the Hearing Examiner and granted Sea-Land's application except as to service by non-self-propelled vessels.

Petitions for reconsideration of the Commission's order were denied on June 23, 1967 by the Commission, Division 1, acting as an appellate division.

In this action, which was instituted by only the railroad protestants in the proceeding before the Commission, the plaintiffs seek to enjoin, set aside, annul and suspend the Commission's said orders of February 20, 1967 and June 23, 1967. Sea-Land has intervened as defendant.

At the hearing in the instant proceeding, certified copies of the record and proceedings had before the Interstate Commerce Commission were introduced as exhibits.

This cause came on to be heard before a duly designated three-judge statutory court which finds that it has jurisdiction of the subject matter hereof and of the parties hereto.

It appears that Sea-Land provides a containership-type of transportation. The shipper, at his plant, packs the shipment into a large demountable container, resembling a van, which is then placed on a highway trailer chassis for transportation to the port. At the port, the container is lifted intact to the ship for carriage by water. Finally, at its port of destination, the container is lifted from the ship, placed on a motor vehicle and, still intact, is conveyed to the consignee. The Hearing Examiner, in his report, likened the operation to trailer-on-flatcar service, saying, "Except for the use of water-borne vessels, the service is very similar to the railroad trailer-on-flatcar (TOFC) service, the deck of the vessel being similar to the flatcar."

It further appears that the newer containership-type of operation is faster and less expensive than the so-called break-bulk service and that there is less damage to lading.

Plaintiffs have advanced a number of contentions, some of which, briefly, are —

That Sea-Land has not established the economic feasibility of its proposed operation; that the proposed operation might prove to be unprofitable; and that it has not been established that Sea-Land is fit, willing and able to perform the proposed service;

That Sea-Land has failed to establish a substantial public need for the proposed service and that existing rail, TOFC and motor carrier service on the Pacific coast is available to shippers;

That no finding was made by the Commission on the impact of the proposed service on existing carriers now serving shippers on the Pacific coast;

That the grant of rights is premature on the ground that Sea-Land had no real intention of instituting a service within a reasonable time; that Sea-Land's actual Pacific coastwise service has not conformed to that which it indicated it proposed to operate and that the Commission erred in refusing to reopen the proceedings to develop this fact.

It appears that Sea-Land is a financially responsible and experienced carrier, capable of conducting the proposed operation. In 1964, it had total assets of $56,340,371 compared with total current liabilities of $18,568,802. In the same year it had gross revenues of $83,905,646, and a net income after taxes of $5,385,310. Sea-Land's total tons of cargo handled rose from 955,173 tons in 1956 to 2,202,680 tons in 1964 and of its 1964 cargo, 1,078,353 tons comprised United States domestic freight. (329 I. C.C. 447, 451)

█ The Commission possesses a wide range of discretionary authority in determining whether the public interest warrants certification of any particular proposed service. (Schaffer Transportation Co. v. United States et al., 355 U. S. 83, 88, 78 S.Ct. 173, 2 L.Ed.2d 117) The Commission, which stated that in its opinion Sea-Land had demonstrated a public need for the proposed service, concluded that it was not impressed with protestants' contention that Sea-Land's operations would not be economically feasible or profitable. At the hearing in this cause, the attorney for the Interstate Commerce Commission pointed out that this is an unusual situation in which the railroads are arguing that their competitors should not be allowed to operate because they do not think their competitors are going to be able to make any money. He observed that it is unusual for the railroads to express concern such as this for water carriers. It would appear, under the circumstances of this case, and particularly in view of the stature and experience of the applicant carrier, Sea-Land, that future profit or loss from the proposed operation should be relegated to the concern of the applicant's investors.

Plaintiffs appear to ride two horses in different directions at the same time when they urge that Sea-Land's Pacific coastwise service will have too great a competitive impact and then argue that Sea-Land is not providing the Pacific coastwise service and has no real intention of instituting a service within a reasonable time.

█ This latter point was included in plaintiffs' (railroad protestants') petition before the Commission for reconsideration and for relief under Rule 1.102. In its reply thereto, Sea-Land acknowledged that it had diverted certain of its vessel tonnage to the United States Government for military use and was therefore unable to commence immediately the service authorized by the certificate. We agree with Sea-Land that it should not, under these circumstances, be penalized by withholding its authority at this time.

The Commission found that no water-carrier container-ship service is available between points along the Pacific coast and that a representative section of the shipping public in this area has shown that a need exists therefor. The Commission continued (at page 456)—

"A number of the supporting shippers were users of coastwise break-bulk service provided prior to 1939 and by Coastwise Lines between 1952 and 1959. The shippers believe that the operations proposed by applicant will restore water carrier transportation that historically aided in serving the economic needs of commerce and industry at points along the Pacific coast. Moreover, many of the shippers feel that a containerized water-carrier service is required in addition to existing services in order to give them the advantages of a third mode of transportation. A preponderance of those supporting the application did so because of the anticipated lower rates. Some shippers, however, testified that they would utilize applicant

at equal costs because of the advantages of easy handling, expeditious loading and unloading, and less damage to lading. We do not believe that the shippers should be denied the inherent advantages of water transportation merely because of the presence and adequacy of existing motor and rail services."

Congress declared that its National Transportation Policy (54 Stat. 899) was, among other things, to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers—all to the end of developing, coordinating and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense.

The applicant in this case is not another railroad in competition with plaintiffs nor is it a motor carrier operating on land in competition with the plaintiff railroads. It is a carrier by water—a mode of transportation which Congress has recognized as an integral part of the national transportation system, along with highway and rail—and has declared should be developed, coordinated and preserved.

■ Albeit that the plaintiff railroads and other types of carriers are able to provide a reasonably adequate service to the public, yet the proposed service by Sea-Land—a containerized carriage by water routes—is a distinct type of service not offered by any other carrier and is not otherwise available to shippers in the Pacific coast area. This court agrees with the Commission that shippers should not be denied the inherent advantages of water transportation merely because of the presence and adequacy of existing motor and rail services.

■ Having examined the Commission's Report and order of February 20, 1967, the certified copies of the record and proceedings had before the Interstate Commerce Commission, the Commission's order of June 23, 1967, the pleadings in the instant proceeding and the briefs of counsel, and having had the benefit of oral argument of counsel, this court concludes that the ultimate findings of the Commission in this case are supported by substantial evidence and by basic factual findings. This court further concludes that the Commission's order of February 20, 1967 is supported by substantial evidence on the record, viewed as a whole, and by adequate findings of the Commission, based upon that evidence. Said order has a rational basis, and the Commission's action was not arbitrary, capricious or an abuse of discretion, and is in all respects in accordance with law.

Concerning the Commission's order of June 23, 1967, which denied the railroad protestants' petition for reconsideration: The Commission properly exercised its discretion in ruling that the proceeding should not be reopened for reconsideration or for granting any of the relief sought in the petition.

This court finds that the holdings and decisions of the Commission were proper and therefore affirms the Commission's orders of February 20, 1967 and June 23, 1967.

The relief prayed for by plaintiffs should be denied and the complaint should be dismissed.

This memorandum opinion shall constitute the court's findings of fact and conclusions of law.

Judgment in accordance with opinion.