**NAVAJO FREIGHT LINES, INC., and Strickland Transportation Co., Inc., Plaintiffs,**

v.

**UNITED STATES of America and the Interstate Commerce Commission, Defendants,**

**and**

**Transcon Lines, Red Ball Motor Freight, Inc., Denver-Amarillo Red Ball Motor Freight, Inc., Braswell Motor Freight Lines, Inc., Braswell Freight Lines, Inc., and Fort Worth and Denver Railway Company, Intervening Defendants.**

**Civ. A. No. 6660.**

United States District Court
D. Colorado.

Aug. 23, 1960.

John R. Barry, Denver, Colo., for plaintiff Navajo Freight Lines, Inc.

Ewell H. Muse, Jr., Austin, Tex., for plaintiff Strickland Transp. Co., Inc.

Robert A. Bicks, Acting Asst. Atty. Gen., and James H. Durkin, Atty., Dept. of Justice, Washington, D. C., Donald G. Brotzman, U. S. Atty., and W. Richard McMartin, Asst. U. S. Atty., Dist. of Colo., Denver, Colo., for defendant U. S.

Robert W. Ginnane, Gen. Counsel, and Francis A. Silver, Associate Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for defendant Interstate Commerce Commission.

John H. Lewis, Denver, Colo., Thomas H. Law of Tilley, Hyder & Law, Fort Worth, Tex., and M. Ward Bailey of Christopher & Bailey, Fort Worth, Tex., for intervening defendants Braswell Motor Freight Lines, Inc., Braswell Freight Lines, Inc., and Fort Worth and D. Ry. Co.

John H. Lewis, Denver, Colo., and Wentworth E. Griffin and Lewis A. Dysart of Reeder, Griffin & Dysart, Kansas

City, Mo., for intervening defendant Transcon Lines.

Marion F. Jones and Alvin J. Meiklejohn, Jr., of Jones, Meiklejohn & Kilroy, Denver, Colo., and Charles D. Mathews and James H. Keahey of Clark, Mathews, Thomas, Harris & Denius, Austin, Tex., for intervening defendants Red Ball Motor Freight, Inc., and Denver-Amarillo Red Ball Motor Freight, Inc.

Before BREITENSTEIN, Circuit Judge, and KERR and ARRAJ, District Judges.

BREITENSTEIN, Circuit Judge.

This action is to set aside an order of the Interstate Commerce Commission, hereinafter referred to as Commission, denying authority for the purchase by plaintiff Navajo of certain operating rights of the plaintiff Strickland. Five motor carriers and one rail carrier have intervened on the side of the defendants. Jurisdiction exists under 28 U.S.C. § 1336, and 28 U.S.C. § 2325 requires that the case be heard by a three-judge district court.

Navajo and Strickland filed a joint application with the Commission under 49 U.S.C.A. § 5 requesting authority for Navajo to purchase Strickland's regular-route interstate rights to transport by motor carrier general commodities and dangerous explosives between Fort Worth and Dallas, Texas, and Amarillo, Texas, and intermediate points.[1] Approximately four months prior to the filing of this application the Texas Railroad Commission had approved the purchase by Merchant's Fast Motor Lines, Inc.,[2] of Strickland's Texas intrastate certificates embracing the transportation of commodities generally over regular routes corresponding to those covered by Strickland's interstate rights which Navajo seeks to purchase. Approval of this transaction by the Commission was not required because of the exemption found in 49 U.S.C.A. § 306(a). Merchants filed a statement with the Commission reporting the transaction and immediately started operations thereunder. It is clear that the Strickland-Merchants transaction involved the retention by Strickland of interstate rights and the utilization by Merchants of the purchased intrastate rights to support operations in interstate commerce under the second proviso of § 306(a).

The joint application of Navajo and Strickland was protested by a number of carriers, both motor and rail. The matter was referred to an examiner who held a hearing and recommended that the application be denied. Division 4 of the Commission sustained the examiner holding that the proposed transaction would not be consistent with the public interest as required by § 5(2) (b).[3]

Navajo and Strickland contend that: (1) the Commission exceeded its statutory power in considering the sale by Strickland to Merchants of its Texas intrastate rights and in finding that it would not be consistent with the public interest to approve the purchase by Navajo of the Strickland interstate rights because of the previous sale of the intrastate rights; (2) the Commission finding that the Navajo purchase of the Strickland interstate rights would result in duplicate operations is contrary to the evidence; and (3) the denial of authority imposes a penalty or sanction on Strickland for doing what it had a legal right to do.[4] With certain exceptions, 49 U.S.C.A. § 306 forbids a motor carrier to operate in interstate and for-

---

[1]. The joint application covered an alternate transaction involving an application under 49 U.S.C.A. § 307 but this has been abandoned. A separate application by Navajo on the Finance Docket for authority to issue certain notes is involved but need not be separately considered

[2]. Hereinafter called Merchants.

[3]. The report of Division 4 is found at 75 M.C.C. 713.

[4]. Navajo and Strickland also contest the finding of the Commission that approval of the transaction would result in a duplicate service between Fort Worth and Dallas but this contention is not pertinent to the disposition which we make of the case.

eign commerce unless it holds a certificate of public convenience and necessity issued by the Commission. One of the exceptions is found in the second proviso of § 306(a) (1), which provides that the certificate of the Commission shall not be required of a carrier lawfully engaged in operations solely within a state for the transportation of persons and property in interstate or foreign commerce between places within such state if there be a board within the state with authority to grant such a certificate and the carrier has obtained the same from that board.[5] The effect of the second proviso is to delegate to the states, not to the Commission, the authority to determine the need for additional interstate service by a carrier operating within the confines of a single state.[6] In Sunset Motor Lines Extension—Interstate Operations, 61 M.C.C. 123, 126, the Commission held that it had no power to prevent an interstate carrier from selling intrastate rights. Indeed, the propriety of the sale to Merchants is not questioned here. The issue is the effect of that sale on the approval of the later sale to Navajo.

The sale of interstate operating rights by and to interstate carriers requires authorization by the Commission and, by the provisions of 49 U.S.C.A. § 5(2) (b), a condition precedent to approval is a finding by the Commission that the transaction "will be consistent with the public interest."[7] The query, then, is whether, in determining consistency with public interest, the Commission may consider the previous split of authority as permitted by the second proviso.

Prior to the sale to Merchants, Strickland had authority to transport property from Dallas-Fort Worth to Amarillo and to serve intermediate points. Such property could move between local points, between local points and other Texas points, or between local points and points in other states. Such authority was for one carrier, Strickland. After the sale and the approval by the Texas Commission, in conformity with the second proviso, Merchants had authority to transport between the local Texas points and also between such points and destinations in other states. At the same time Strickland, as the law permits, retained the right to serve the same points in so far as property destined for interstate commerce is concerned. Thus, for the transportation of property moving in interstate commerce and originating in or destined for the Texas points involved, authority was granted to two carriers instead of the one which had held the authority prior to the sale. In other words, the authority was then split between two carriers.

5. The second proviso of § 306(a) (1) reads thus: "That this paragraph shall not be so construed as to require any such carrier lawfully engaged in operation solely within any State to obtain from the Commission a certificate authorizing the transportation by such carrier of passengers or property in interstate or foreign commerce between places within such State if there be a board in such State having authority to grant or approve such certificates and if such carrier has obtained such certificate from such board. Such transportation shall, however, be otherwise subject to the jurisdiction of the Commission under this chapter."

6. Cf. Oswego Transportation Lines, Inc. v. Feinberg, 7 A.D.2d 268, 181 N.Y.S.2d 1007, 1011; Cumberland Motor Freight, Inc. v. Huber & Huber Motor Express, Ky., 311 S.W.2d 398, 401-402.

7. The applicable language of § 5(2) (b) is: "If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subdivision (a) of this paragraph and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable." It is admitted that the examiner correctly found that the purchase price was reasonable, that the increase in fixed charges to be incurred by Navajo would not be contrary to the public interest, that Navajo had sufficient capital assets, and that no employees of the applicants would be adversely affected.

In considering whether the sale by Strickland to Navajo should be given approval it was proper for the Commission to give consideration to this split of authority. The term "public interest," as used in § 5(2) (b), is to be construed in the light of the national transportation policy established by Congress in 1940.[8] This policy is the guide to the public interest and the yardstick by which the actions of the Commission will be measured.[9] The term "public interest," as used in § 5(2) (b), embraces the interests of competing carriers.[10] In deciding whether the Navajo-Strickland transaction was consistent with the public interest the Commission had to concern itself with the existing carrier operations in interstate commerce within the territory. One of these operations was that of Merchants. It had to be considered along with all the other operations in the area.

This conclusion in no way impinges upon the operation of the second proviso. The power there delegated to the states is recognized and the propriety of the split of authority is not questioned. This case does not involve any issue as to the legality of the services rendered by Merchants and Strickland after the sale to Merchants. Further, no question is presented as to the right of Strickland to sell the authority remaining after the Merchants sale. All that is meant is that when Strickland and Navajo apply for authority to consummate their transaction, the Commission must consider the conditions as they exist after the sale to Merchants in determining consistency with the public interest. The question is not whether Strickland has the right to sell to Navajo but whether such sale is consistent with the public interest under the conditions then pertaining. This requires a review of the facts.

Navajo transports general commodities over regular routes, principally between Chicago, Illinois, and Los Angeles and San Francisco, California. It also serves numerous intermediate points including Denver, Albuquerque and Amarillo. It is a substantial carrier having about 1,300 employees and 1,360 pieces of equipment. During the first ten months of 1957 it had gross operating revenues in excess of $16,000,000.

Strickland's general-commodity operations, including those of its affiliate,

---

8. Act of September 18, 1940, c. 722, Title 1, § 1, 54 Stat. 899, 49 U.S.C. preceding § 1. The declaration of policy is this: "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, * * * so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions; —all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

9. Schaffer Transportation Co. v. United States, 355 U.S. 83, 87–88, 78 S.Ct. 173, 2 L.Ed.2d 117.

10. In McLean Trucking Co. v. United States, 321 U.S. 67, 83–84, 64 S.Ct. 370, 379, 88 L.Ed. 544, the Court said: "The origins and legislative history of the Motor Carrier Act adequately disclose that in it Congress recognized there may be occasions when 'competition between carriers may result in harm to the public as well as in benefit; and that when a [carrier] inflicts injury upon its rival, it may be the public which ultimately bears the loss.'" See also Ratner v. United States, D.C., 162 F.Supp. 518, 519, affirmed 356 U.S. 368, 78 S.Ct. 913, 2 L.Ed.2d 842.

Kelleher Motor Freight Lines, Inc., extend from Texas points to New York City. Strickland's intent is to use the proceeds of the sales to Merchants and Navajo to rehabilitate the operations of its affiliated carrier. As that affiliate does not operate over the routes involved, its rehabilitation has no effect on the public interest in so far as the area affected here is concerned.

Navajo's principal connecting carrier on traffic moving through the Amarillo gateway had been Red Ball Motor Freight Lines, Inc. In December, 1956, Red Ball acquired control of Denver-Amarillo Express, a competitor of Navajo between Denver and Amarillo. Thereafter the volume of interchange between Navajo and Red Ball decreased considerably. Navajo then determined to purchase authority to transport between Amarillo and Dallas in order to avoid a repetition of "the Red Ball cut-off." Navajo would benefit by the extension of its operations to the Dallas gateway, not only because it would be relieved of the necessity of the Amarillo interchange but also because it would open the opportunity to compete for traffic moving beyond Dallas, particularly in Texas and Louisiana.

While it is apparent that the transaction would be to the self-interest of both Strickland and Navajo, it is the public interest that is controlling. This requires consideration of competing carriers.

The carriers protesting the application presented evidence of the adverse effect which the acquisition by Navajo of the Strickland interstate rights would have upon them. It was shown that Strickland's operations to and from intermediate points, while not dormant, had not been of competitive significance. Navajo is an aggressive and vigorous competitor

especially as to local traffic. With the institution of Merchants' operations the protestants experienced an intensification of competition at all points on the considered routes. Convincing evidence was presented that there was no need for any additional transportation over these routes.[11] The protestants asserted that they could not afford to lose any Texas traffic and should not be forced to face competitive operations of two carriers where only one existed previously.

No affirmative evidence was presented by Navajo or Strickland to show any public need for approval of the transaction or to show that any benefit would arise therefrom except that which would result to Navajo and Strickland. On such record the Commission found that:[12]

"* * * protestants' ability to continue to provide adequate, efficient, and economical services in the considered territory would be adversely affected by the performance of the duplicate operations in interstate or foreign commerce resulting from the transaction proposed."

■ The argument of Navajo and Strickland does not contest the claim that there might result an adverse effect on competitors. Instead, they say that the Strickland authority has been split legally, that there are now in existence two carriers where but one existed before, that the transfer of the remaining Strickland right to Navajo does not increase the number of competing carriers, and that to deny Strickland the right to sell to Navajo is to punish it for doing what it had a lawful right to do, i. e., sell to Merchants under the protective covering of the second proviso. The argument is not persuasive. In selling to Merchants Strickland did what it had a right to do. This is not questioned. The result, however, was to bring anoth-

---

11. One protestant presented the statements of 11 shippers and receivers of freight at points on the considered routes to the effect that no need exists for additional transportation services. Typical is the statement of A. W. Huffman, an official of the Reed Roller Bit Co.,

Houston, Texas, who said: "We are now being adequately served by the existing carriers and we have no need for additional service between the above mentioned points."

12. 75 M.C.C. 721.

er competitor into the area. When the Navajo-Strickland transaction was presented to the Commission, it had to take the situation as it then existed and consider the public interest in the light of the services that existed after the split. Strickland was responsible for the split and must accept the consequences.

■■ The substance of the position of Navajo and Strickland is that Strickland holds an operating right which it wishes to sell and that Strickland should be permitted to make the sale because there results no increase in the total number of carriers. The right to sell is subject to the qualification that authority must be obtained from the Commission. Such authority may not be granted unless the transaction is consistent with the public interest. In determining the effect on the public interest the fact that there is no increase in the total number of carriers is not the sole criterion. The national transportation policy is that the act be administered so as to "foster sound economic conditions in transportation and among the several carriers." Thus, the public has an interest in the prevention of uneconomic transportation. The evidence shows, and the Commission found, that the proposed transaction would disrupt the competitive situation and harm the competing carriers. There was no showing of any benefit to the public. The only claim of benefit is to Navajo and Strickland. The enhancement of their economic and competitive position at the expense of their competitors is not consistent with the public interest when the result is to damage their competitors without at the same time providing some benefit to the public.

■■ The Commission found that it had not been shown that the proposed transaction would be consistent with the public interest. The burden was on Navajo and Strickland to sustain their application.[13] The scope of judicial review is limited.[14] Indeed, the role of the reviewing court is particularly limited in a case such as that at bar. By statute the Commission has the responsibility of determining whether a transaction presented for approval under § 5(2)(b) is consistent with the public interest. Because of its expertise that body is equipped to resolve all factors and to reach a conclusion that conforms to the declared national transportation policy. As said in the McLean Trucking Co. case, quoting in part from the Congressional Record:[15]

" 'The wisdom and experience of that commission,' not of the courts, must determine whether the proposed consolidation is 'consistent with the public interest.' "

In the instant case the Commission did not exceed its statutory limits. Its findings are adequate and supported by convincing evidence. They must be sustained. Having reached this conclusion, it is unnecessary to consider the technical procedural questions raised by the defendants and intervenors. The action of the Commission in denying the applications is affirmed.

The findings of fact and conclusions of law of the court sufficiently appear in this opinion and need not be stated separately. The clerk will prepare and submit a judgment denying the injunction and dismissing the case.

KERR, District Judge (dissenting).

I think the Commission misconstrued its authority under the Act. Basically, the Commission's denial of the application of Navajo to purchase certain operating rights of Strickland was the result of a prior sale by Strickland to Merchants of Strickland's intrastate operating rights between Amarillo, Dallas-Fort Worth, Texas. The Commission held that this sale would result in the performance of duplicate operations in interstate or foreign commerce. In my

13. Administrative Procedure Act § 7(c), 5 U.S.C.A. § 1006(c); Houff Transfer v. United States, D.C., 105 F.Supp. 851, 855.

14. Denver Chicago Transport Co., Inc. v. United States, D.C., 183 F.Supp. 785.

15. 321 U.S. 87–88, 64 S.Ct. 381.

opinion this is an erroneous conclusion. If the transfer had been approved it would mean a substitution of Navajo for Strickland. If the application is denied Strickland will continue operations between these same points. Whether the application is approved or denied there will still remain the same number of carriers operating between these same points.

Not only the Commission, but the Examiner was influenced by the sale of Strickland's intrastate rights to Merchants. His finding was approved by the Commission as follows: "The examiner, in his report, found, among other things, that the purchase price payable for the rights and physical property under each plan was reasonable, that the increase in fixed charges which would be incurred by Navajo, would not be contrary to the public interest, that it would have sufficient capitalizable assets to support the increase in its capitalizat·n resulting from the issuance of notes proposed, and that no employees of applicants would be adversely affected". The Examiner, however, excepted to the "split" of a single operating right which would result from the interstate sale.

The Commission in its decision states: "As indicated, the question here presented is whether it would be *consistent with the public interest* to approve the purchase by Navajo of Strickland's interstate rights while at the same time a duplicate service has already been created in Merchants as a result of the sale to the latter by Strickland of its intrastate rights and the registration of those rights by Merchants under the proviso. *The burden is upon applicants to present affirmative evidence along those lines if the question is to be resolved in their favor."* (Emphasis added.) This is not a correct statement of the law. See Ratner v. United States, D.C., 162 F. Supp. 518, affirmed 356 U.S. 368, 78 S.Ct. 913, 2 L.Ed.2d 842.

As I view this case the question is not one of merely weighing the evidence which is within the sole province of the Commission. The principal issue is whether the Commission's order is within the scope of the Act, and whether it is based upon adequate findings that are supported by substantial evidence. The Commission held that Strickland was "responsible for creating two operations in interstate or foreign commerce". Congress by its enactment of the second proviso of Section 206(a) of the Motor Carrier Act (49 U.S.C.A. § 306) has precluded the Commission from interfering with intrastate operations. If two operations have been created then the fault lies with the statute and not Strickland. Neither can it be said that a carrier is precluded from selling its interstate rights after it has sold its intrastate rights, as a consequence of which sale interstate operations ensue, nor can it be said that there is any factual basis for the conclusion of the Commission that Strickland's sale to Merchants "was entirely without regard to any public need for additional service * * *". The determination of public necessity under the second proviso was exclusively within the purview of the authority delegated to the Texas Railroad Commission.

It is apparent from the Commission's decision that it has extravagantly used the term "consistent with public interest". In construing the national transportation policy set out in the Act I think that the following terms and phrases of the Commission are not synonymous with the statutory criterion of "consistent with public interest"; "no need exists for additional transportation services"; "Public Convenience and necessity"; "no inadequacy has been shown to exist in the services presently provided"; "no public need has been shown for the new and different service".

The term "public interest" includes not only the interest of competing carriers but also free enterprise. The decision of the Commission is replete with references to the adverse effect the proposed sale would have on the protestants, revealing a super-abundance of sympathy with their competitive problems. Nowhere in the decision did the Commission give consideration to the consequences

of present or future competition to the public interest. The element of competition comes into play only when it adversely affects the public interest. The purpose of the Act is to foster the public interest and not to immunize carriers from additional and competitive carriers, nor to preserve existing arrangments or competitive practices. Control, not prevention, of competition is the object of the Act.

It is not without significance or relevance that the Commission, having granted a certificate to Strickland in the first instance based on public convenience and necessity, now denies Strickland the right to sell the certificate to Navajo, holding that the burden is on Strickland to show public convenience and necessity. Too, we are dealing with a valuable property right which in effect the Commission has held Strickland cannot sell. This decision strikes at the very heart of our free enterprise, which has long distinguished our economy. I do not believe Congress intended to give the Commission carte blanche authority to substitute its judgment for that of the parties on the question of whether a sale should or should not be made. The statute simply states (49 U.S.C.A. § 5, par. (2) (a) "It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—(i) * * * for any carrier, or two or more carriers jointly, to *purchase,* lease, or contract to operate the properties, or any part thereof, of another; * * *". (Emphasis added.)

In this case the strength of the competitors seems more apparent than a transportation need. From what I have said I would return this case to the Commission for reconsideration of the application with the recommendation that the Commission desist from weighing the effect of Strickland's sale of its intrastate rights to Merchants, and from giving the protestants unwarranted protection against competition; that it reassess its concept of public interest in the light of benefits of the proposed transaction to the public; that it give regard to the inherent advantages of the proposed service; that the Commission be more exact in its finding that the division of Strickland's interstate rights would result in an objectionable split of a single operating right; that in the event such a split is, in fact, improper, then the Commission could qualify the application to avoid the split. Such a circumstance should not be the basis for disapproval of the application when all other conditions are met.