**BRASWELL MOTOR FREIGHT LINES et al.**

v.

**UNITED STATES of America and Interstate Commerce Commission.**

Civ. A. No. 5–368.

United States District Court
N. D. Texas,
Lubbock Division.

Sept. 27, 1967.

---

W. D. Benson, Jr., Frank Garrison, Lubbock, Tex., Morris G. Cobb, Amarillo, Tex., Phillip Robinson, Mert Starnes, James, Robinson, Felts & Starnes, Austin, Tex., Tom L. Farmer, Thomas A. Loose, Atty., Texas & P. Ry. Co., Dallas, Tex., for plaintiffs.

John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Melvin M. Diggs, U. S. Atty., Fort Worth, Tex., for defendant United States.

Robert W. Ginnane, Gen. Counsel, Raymond M. Zimmet, Atty., I. C. C., Washington, D. C., for defendant Interstate Commerce Commission.

Waggoner Carr, Key, Carr, Carr & Clark, Lubbock, Tex., Paul F. Sullivan, Kilroy & Sullivan, Washington, D. C., Ewell H. Muse, Jr., Austin, Tex., for intervening defendant, Albuquerque Phoenix Express, Inc.

Before BROWN, Circuit Judge, and HUGHES and TAYLOR, District Judges.

WILLIAM M. TAYLOR, Jr., District Judge:

This is an action by nine motor and rail carriers [1] to set aside a certificate of public convenience and necessity issued under § 207(a) of the ICC Act, 49 U.S.C.A. § 307(a), authorizing Albuquerque-Phoenix Express, Inc. to operate as a motor carrier between Roswell, New Mexico and Hobbs, New Mexico, and to set aside an order issued pursuant to § 5 of the ICC Act, 49 U.S.C.A. § 5, approving the sale by Navajo Freight Lines, Inc. of its interstate operating authority between Odessa, Texas and Hobbs, New Mexico (and surrounding southeastern New Mexico points), to Albuquerque Phoenix Express. We affirm both orders.

In February, 1964, Albuquerque Phoenix Express (Apex) filed its application for a certificate of public convenience and necessity for motor carriage of general commodities between Roswell, New Mexico and Hobbs, New Mexico. At the same time Apex sought Commission approval of its purchase of the interstate motor carrier authority between Odessa, Texas and Hobbs, New Mexico, owned by Navajo. Following the published notice of such applications numerous motor and

---

1. Braswell Motor Freight Lines, Consolidated Copperstate Lines, Inc., Illinois-California Express, Inc., Lang Transit Company, Texas & Pacific Railway Company, Texas & Pacific Motor Freight Company, Texas-New Mexico Railway Company, T.I.M.E. Freight, Inc., and Whitfield Transportation, Inc.

rail carriers filed protests [2] in opposition to the applications. The Section 5 purchase application was assigned to a hearing examiner. The Section 207 extension application was delegated to a joint board.[3] The applications were consolidated for hearing at Odessa, Texas. In August, 1965, both the board and the examiner rendered their reports in which they approved the respective applications of Apex. Protestants filed timely exceptions.

In June, 1966, Division 3 of the Interstate Commerce Commission, in a consolidated decision and order upheld and adopted the findings and conclusions of the board and examiner. This same division, acting in an appellate capacity, denied protestants' petitions for reconsideration in September, 1966. Plaintiffs thereafter initiated this lawsuit.

Plaintiffs assail the jurisdiction of the Commission to enter an order in the purchase application cause on the ground that the notice of the hearing as published in the *Federal Register* was defective.[4] The contention is made that the Commission approved the purchase to include Odessa, Texas, within the route which Apex was to acquire when in fact notice had not been published to that effect.

 We fail to see the merit in this proposition. The publication expressed that among the routes to be considered was that "between Andrews, Tex., and Kermit, Tex., serving all intermediate points," within which is Odessa, Texas. Indeed, three of the protestants filed with the Commission their objections to the proposed sale of authority on the grounds that it would duplicate an existing route [5] and that there was no need for service to Odessa.[6] We adopt the lan-

:2. All plaintiffs herein filed protests. Tri-State Motor Transit Co., Western Gillette, Inc., and Texas-Arizona Motor Freight. Inc. filed protests, but do not prosecute this lawsuit.

3. The Commission initially designated Joint Board No. 129, a New Mexico-Arizona board by definition, to hear the § 5 case. This board, composed of a single member of the New Mexico State Corporation Commission, heard 5 days of testimony at which time the Commission, in response to protestants' objection to the propriety of a New Mexico-Arizona Board considering a New Mexico-Texas application, redesignated Joint Board No. 87 as the appropriate administrative forum. The effect of this reassignment was to substitute a different member of the New Mexico State Corporation Commission to preside over the remainder of the hearing. Both examiners prepared and signed the Examiner's Report.

4. Federal Register, March 4, 1964, pp. 2974–75:
"*General Commodities*, excepting, among others, household goods and commodities in bulk, as a common carrier over regular routes, between the junction of Texas Highway 115 and Texas Farm Road 126 (formerly Texas Farm Road 781), and Jal, N. Mex., serving all intermediate points, over an alternate route for operating convenience only; class *A and B explosives*, and *general commodities*, except those of unusual value, house-

hold goods as defined by the Commission, commodities in bulk, commodities requiring special equipment, and those injurious or contaminating to other lading, between Hobbs, N. Mex., and Wink, Tex., between Andrews, Tex., and Kermit, Tex., serving all intermediate points, and serving certain off-route points with certain restrictions, between Andrews, Tex., and Eunice, N. Mex., serving all intermediate points; *general commodities*, except household goods as defined by the Commission between Kermit, Tex., and Monahans, Tex., serving no intermediate points; *government-owned compressed gas trailers*, loaded with compressed gas (Other than liquefied petroleum gas) or empty, between all of the points and over the regular and alternate routes in and through the States of New Mexico and Texas."

5. Lang Transit protested for the reason that "in its * * * (Sub 20) application Lang seeks authority to conduct operations between Hobbs, New Mexico, and Odessa, Texas * * * the authority sought to be acquired by * * * 'Apex' would substantially duplicate that proposed by Lang's Sub 20 application." Texas-Arizona objected because "the instant applications would result in a new single-line service between Odessa, Texas, and Phoenix, Arizona * * *."

6. Western Gillette filed a protest in which it asserted that "with the granting of these authorities, it is the belief of this

guage of the hearing examiner in disposing of plaintiffs' contention:

> * * * Publication of notices in the Federal Register are required to be brief and not cumbersome. To set out all route numbers over which the carrier may operate between the point involved in the purchase, and the names of all intermediate points authorized to be served would certainly encumber the Federal Register and be prohibitive. Protestants were put on notice that all intermediate points would be involved * * *

Plaintiffs urge that even if the motor carriers had sufficient notice the general public did not. The published notice referred the readers to the application of Apex on file with the Commission. This application and its contents were readily available to any member of the public who was interested enough in the notice to pursue the matter. We perceive no prejudice to plaintiffs or the general public.

█ It is urged upon the court that the approval by the Commission of the financial proposal was erroneous. This is so, according to plaintiffs, for two reasons. First, Navajo in 1962 sold its intrastate authority in Texas, which corresponded to the interstate authority now the subject of litigation, to another motor carrier and under existing case law cannot now sell that interstate authority. A brief statement of history will illustrate this contention.

In 1962, Navajo held intrastate authority in Texas and New Mexico and interstate authority between both states. In May of that year, Navajo sold to Merchants Fast Freight Lines its Texas intrastate operating rights. Merchants, which at that time was a wholly intrastate carrier in Texas, registered its newly acquired intrastate rights with the ICC and thereupon became entitled to motor carriage rights of interstate scope. Merchants neophyte interstate authority

corresponded with the interstate authority retained by Navajo. Thus, it is admitted by all parties, an additional interstate operating right was created where theretofore only one such right had existed. Plaintiffs' unlawful sale proposition is that corresponding intrastate and interstate authorities cannot be split off to different vendees and create in the process an additional interstate carrier. Navajo Freight Lines v. United States, 186 F.Supp. 377 (D.Colo.1960). The *Navajo* case does not, however, support plaintiffs' contention. Quite to the contrary, it is authority for our holding that the sale herein complained of violates no legal proscription. The split-off in Navajo involved the Strickland Transportation Company as vendor of intrastate rights to Merchants Fast Freight and of a subsequent sale of interstate rights to Navajo. The Commission action in issue was the denial of authority for Navajo to purchase the Strickland interstate rights. As in this case, the sale of the intrastate rights created an additional multi-state carrier along a route corresponding to the retained and subsequently proposed-to-be-sold interstate route. The district court said:

> In considering whether the sale by Strickland to Navajo should be given approval it was proper for the Commission to give consideration to this split of authority. * * * In deciding whether the Navajo-Strickland transaction was consistent with the public interest the Commission had to concern itself with the existing carrier operations in interstate commerce within the territory. One of these operations was that of Merchants. It had to be considered along with all the other operations in the area. This conclusion in no way impinges upon the operation of the second proviso. *The power there delegated to the states is recognized* and the propriety of that split of authority is not questioned.

protestant that [Apex] would be authorized to transport general commodities between Phoenix, Arizona, and Odessa, Texas * * *. There is no need for service between Odessa and Phoenix."

This case does not involve any issue as to the legality of the services rendered by Merchants and Strickland after the sale to Merchants. Further, no question is presented as to the right of Strickland to sell the authority remaining after the Merchants sale. All that is meant is that when Strickland and Navajo apply for authority to consummate their transaction, the Commission must consider the conditions as they exist after the sale to Merchants in determining consistency with the public interest. The question is not whether Strickland has the right to sell to Navajo but whether such sale is consistent with the public interest * * *. 186 F.Supp. at 381. [Emphasis added]

■ The proviso to which the quoted portion of the district court's opinion refers is § 306(a)(1) of the ICC Act prior to amendment in October, 1962. That proviso prescribed [7] that before the holder of the intrastate authority could receive approval from the Commission to operate in interstate authority it was incumbent upon him to obtain the sanction of the state board to which authority over such matters had been delegated. In Texas, such commission existed as the Railroad Commission. Article 911b et seq., Vernon's Civil Statutes; Gulf Coast Motor Freight Line, Inc. v. United States, 35 F.Supp. 136 (S.D.Tex., 1940); A. E. McDonald Motor Freight Lines, Inc. v. United States, 35 F.Supp. 132 (N.D.Tex., 1940). While the record does not indicate that the Commission had before it an authorization from the Texas Railroad Commission when it granted Merchants interstate authority, pursuant to its BMC-75 application for such, we must assume that the Commission would not have so acted in the absence of Merchants' compliance with this act of Congress. The authority for authorizing the particular action which plaintiffs claim is unlawful having at the time of the transaction complained of been specifically delegated to the states, the plaintiffs cannot claim and assert with merit that a split of authority is unlawful.

Furthermore, the decisions of the Commission do not support plaintiffs' claims in this respect. In Courier Express, Inc.—Purchase—Huber Motor Transportation Co., 45 M.C.C. 688 (1947), the Commission was faced with an issue similar to the instant one. Huber held corresponding inter- and intrastate operating authorities in Indiana.[8]

In 1945, Huber sold its intrastate authority to Renner Express Co., knowing at that time that Renner intended to apply to the Commission for interstate authority pursuant to § 306(a)(1). The subsequent approval by the Commission of Renner's application resulted in duplicitous interstate routes. In 1946, Huber sought to sell to Courier its remaining interstate authority, which it had permitted to lie idle for some time due to Huber's intent to discontinue business in Indiana. The Commission denied the carriers permission to consummate the sale, stating,

We may not properly sanction the removal from full and active use, and the preservation in existence for subsequent transfer and utilization in an

7. § 306(a) (1): "That this paragraph shall not be construed so as to require any such carrier lawfully engaged in operation solely within any State to obtain from the Commission a certificate authorizing the transportation by such carrier of passengers or property in interstate or foreign commerce between places within such State if there be a board in such State having authority to grant or approve such certificates and if such carrier has obtained such certificate from such board. Such trans-

poration shall, however, be otherwise subject to the jurisdiction of the Commission under this chapter."

8. Huber held the intrastate rights in its own name and its parent corporation, Mohawk Motor, Inc., held the interstate authority. For purposes of the issue before the Commission, the companies were one and the same, Huber having been organized by Mohawk specifically for the purpose of doing business in Indiana.

additional motor carrier of [the retained interstate rights] which are not shown to have a going concern value * * * *and as to which there is no evidence that the existing service is inadequate.* 45 M.C.C. at 695.

The Commission's action in the Courier application and the district court's holding in the Navajo case express what we believe to be the law existing prior to the amendment of § 306, that is, the sole condition on the sale of interstate authority subsequent to a split-off transaction was that the interstate sale be required to conform to the standard of public necessity, and the newly acquired interstate authority of the former intrastate authority vendee was a necessary consideration to be evaluated in arriving at an answer to the public necessity issue.

■ Although in the technical sense Merchants and Apex had duplicate authority under their respective purchases from Navajo, the examiner cancelled that portion of the authority Apex ac-

quired that was a carbon of Merchant's so that an additional carrier would not be operating over a single carrier route. We approve of the examiner's action. Simpson-Purchase-A.A.A. Highway Express, Inc., 45 M.C.C. 463 (1947).

Plaintiffs' second objection to the legality of the purchase is that prior to the sale by Navajo of its interstate authority to Apex it had sold Apex its intrastate rights in New Mexico, which latter sale, it is urged, could not have been consummated under § 306, as amended, without the simultaneous transfer of the corresponding interstate rights, resulting in the forfeiture by Navajo of its interstate authority. Hence, according to plaintiffs, Navajo had nothing to sell Apex.

The Amendment to § 306, passed on October 15, 1962,[9] provides in essence that once a carrier has obtained authority from a state commission to operate in interstate commerce pursuant to its intrastate authority, it may not thereafter transfer the intrastate right without transferring the corresponding inter-

9. § 306(a) (6):
"On and after October 15, 1962 no certificate of public convenience and necessity under this chapter shall be required for operations in interstate or foreign commerce by a common carrier by motor vehicle operating solely within a single State and not controlled by, controlling, or under a common control with any carrier engaged in operations outside such State, if such carrier has obtained from the commission of such State authorized to issue such cerificates, a certificate of public convenience and necessity authorizing motor vehicle common carrier operations in intrastate commerce and such certificate recites that it was issued after notice to interested persons through publication in the Federal Register of the filing of the application and of the desire of the applicant also to engage in transportation in interstate and foreign commerce within the ·limits of the intrastate authority granted, that reasonable opportunity was afforded interested persons to be heard, that the State commission has duly considered the question of the proposed interstate and foreign operations and has found that public convenience and necessity require that the carrier authorized to engage in intra-state operations also be authorized to engage in operations in interstate and foreign commerce within limits which do not exceed the scope of the intrastate operations authorized to be conducted. Such operations in interstate and foreign commerce shall, however, be subject to all other applicable requirements of this Act and the regulations prescribed hereunder. Such rights to engage in operations in interstate or foreign commerce shall be evidenced by appropriate certificates of registration issued by the Commission which shall be valid only so long as the holder is a carrier engaged in operations solely within a single State, not controlled by, controlling, or under a common control with a carrier engaged in operations outside such State, and except as provided in section 5 of this title and in the conditions and limitations stated herein, may be transferred pursuant to such rules and regulations as may be prescribed by the Commission, but may not be transferred apart from the transfer of the corresponding intrastate certificate, and the transfer of the intrastate certificate without the interstate or foreign rights shall terminate the right to engage in interstate or foreign commerce. * * * *"

state rights. Failure to comply with the transfer provisions of this statute terminates the right to operate under the interstate authority. As the sale of Navajo's intrastate New Mexico rights was consummated after the enacting of § 306(a)(6), as amended, and the corresponding interstate rights were not transferred to Apex, it is plaintiffs' contention that Navajo forfeited its interstate operating authority.

The short answer to plaintiffs' position is that § 306(a)(6) is not applicable to the issue before us. The clear import of this amendment is to prevent a wholly intrastate carrier which has obtained authority to operate interstate within its intrastate routes from splitting-off its intrastate authority to a carrier which can thereafter obtain interstate authority on the basis of that intrastate certificate, so as to create two interstate carriers where only one had previously existed. Navajo is not a carrier operating "solely within a single State," and this amendment does not, therefore, apply to it. This is so, because the word "corresponding" as used in the amendment does not mean "similar", but rather the intrastate authority out of which the interstate authority arises. It is the unity of this relationship which the amendment seeks to preserve. Hence, it is only a carrier which is in operation solely within a single state which can apply for, and obtain, interstate authority corresponding to its intrastate authority. The fact that Navajo may have interstate and intrastate authority which are "similar" to each other does not subject it to the provisions of § 306(a)(6).

Furthermore, Apex is also a multi-state carrier. Therefore, once it acquired the intrastate authority from Navajo it could not convert it into interstate authority under § 306(a)(6).

From the foregoing discussion it is apparent that the type of activity at which the amendment was directed is not that which is before the court. We find no aspects of the sales by Navajo of its interstate and intrastate authorities to be in contravention of the law existing at the time of such sales.

Plaintiffs next urge that the sale by Navajo to Apex of its New Mexico intrastate authority was consummated without notice to and approval of the Commission, and that because that transaction was a part of the purchase now under consideration, the failure to present the intrastate sale to the Commission for its approval vitiates the instant transaction.

While section 5 of the ICC Act does require that all phases of a transaction be presented to the Commission for its consideration, failure on the part of the carriers involved to do so will not void the entire purchase when it is otherwise consistent with the public interest. Illinois Central R. R. v. United States, 263 F.Supp. 421 (N.D.Ill.1966), aff'd per curiam, 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509 (1967); Alamo Express, Inc. v. United States, 239 F. Supp. 694 (W.D.Tex.1965), aff'd per curiam, 86 S.Ct. 83, 382 U.S. 19, 15 L.Ed. 2d 14 (1965). Our affirmance of the Commission's finding that the transaction was in the public interest is dispositive of plaintiffs' contention herein.

Plaintiffs' fourth contention is that the Commission committed fundamental error when, in reassigning the financial case to Joint Board No. 87, it failed to order that board to hear, *de novo*, the five days of testimony which Joint Board No. 129 had heard prior to the reassignment.[10] Such contention is wholly without merit. Each of the joint boards were composed of one member of the New Mexico State Corporation Commission. While the examiner who heard the last 9 days of testimony as Board No. 87 did not hear the witnesses who had testified the first 5 days, he read the record of those proceedings before preparing the report. Indeed, both men who presided on the 2 boards prepared and signed the examiner's re-

10. See n. 2, supra.

port, assisting one another in such preparation. We perceive no prejudice to the plaintiffs as a result of the reassignment.

█ In their fifth and sixth points of error plaintiffs express objections to the sufficiency of the evidence to support a finding of public necessity as to both the financial transaction and the extension case. We find the evidence most ample to support the action of the Commission.

The evidence presented to the examiner in the financial case (Hobbs, New Mexico-Andrews, Texas-Odessa, Texas) revealed that

There are 11 or more shippers and receivers of small items who are satisfied with bus service, although there are 21 or more who consider bus service unsatisfactory because of the inconvenience in the pickup and delivery of shipments to the bus station, time consumed by employees in connection therewith, weight limitation, and additional expense involved in the movement of the items. A number use parcel post service for convenience in the movement of shipments. Most of the shippers and receivers desire and have a need for an overnight first morning service as well as same day service from Odessa to Hobbs and other points within the peddle area of Hobbs. There are 42 shippers and receivers who expressed a need for pickup and delivery service on Saturday, and 67 indicated that transit time is very important because of the competitive nature of their products, and the urgent need of the customer. When equipment and materials are needed on rush shipments, the customer meets the shipper halfway between Odessa and Hobbs and at times goes all the way to Odessa to pick up the shipment. This occurs frequently when motor carrier service is not available at the particular time of movement. There were 35 shippers or receivers of freight who used the service of Navajo prior to its cessation of operations between Odessa and Hobbs

or points south of Hobbs and Andrews on the considered routes and desire that such service again be made available to them * * *. The proposed overnight with first morning service at Hobbs and other points in the area, same day service to the same points from Odessa, and pickup and delivery service on Saturday was of real interest and appealed to shippers and receivers. Most of them do not receive such service from Transport which is the only motor carrier operating directly between Odessa and Hobbs, and to that extent Transport has a monopoly on traffic moving between those two points including intermediate points, although a rail affiliate, TNM, operates between Monahans and Lovington.

Based on this evidence, the examiner concluded that

* * * Apex will be able to conduct a profitable operation in the area, and that there is a public need for an additional motor carrier service between Odessa and the points in southeastern New Mexico. * * * The examiner concludes that the considered operating rights of Navajo had been dormant for at least one year. One of the issues is whether the evidence is sufficient to show a public need for revitalization' by Apex of those dormant interstate rights. There is such a need insofar as operations are concerned as shown in Appendix A-1.

The principal concern in the extension case is with traffic moving from Texas points to cities in southeastern New Mexico. A number of these smaller towns, Buckeye, Lovington, Maljamar, Loco Hills, Artesia, Lake Arthur, Tatum and McDonald must depend on bus service for transportation of commodities destined to them. The existing bus service causes inconvenience because of the necessity of pickup and delivery of shipments at the bus station and the time consumed by employees in this respect and weight limitation. Most of the shippers and receivers desire and have need for an overnight first morning service

from Odessa to points beyond Hobbs. A number of shippers and receivers expressed a need for pickup and delivery service on Saturday, and indicated that the time in transit was very important in their business because of the competitive nature of their products, and the urgent need of the customer. In emergencies or when equipment and materials are needed on rush shipments, the customer meets the shipper half way between Odessa and Hobbs to pick up shipment and at times go all the way to Odessa. This occurs frequently when motor carrier service is not available at the particular time of movement. Delays have been encountered at points beyond Hobbs.

There are six or more shippers located at Fort Worth, Dallas and Houston who would use the proposed joint-line service of Merchants and applicant to points beyond Hobbs through Odessa as a gateway. All indicated that they would use the proposed service of applicant. The proposed overnight with first morning service at Hobbs and other points in the area, same day service to the same points from Odessa, and pickup and delivery service on Saturday was of real interest and appealed to the shippers and receivers. Most of them do not receive such service from the only motor carrier operating direct between Odessa and Lovington.

The record is clear that the traffic of the shippers and receivers move in substantial amounts by bus and parcel post into the New Mexico area, and that a substantial portion could move by motor carriers if adequate motor carrier service is made available to them. Their use of the bus and parcel post service is a strong indication that motor carrier service is inadequate to meet their needs in considered territory. The general complaint of the shippers and receivers to the service beyond Hobbs was that shipments were not delivered until some time in the later afternoon or the following day.

The joint board concluded that the public interest would best be served by granting Apex's extension. We find no reason to disturb the decision of the Commission.

Plaintiffs' final proposition is that the Commission acted arbitrarily in granting approval to the financial proceeding in that it failed to comply with its own findings of fact and conclusions of law which it set forth in Lang Transit Company, Extension—Hobbs, MC—110 157 (Sub 20), wherein the Commission, four months before the instant case was heard, found that public necessity did not dictate an additional carrier over the Hobbs-Odessa-Andrews route. While we need not here determine the correctness of the court's statement in Dixie Highway Express, Inc. v. United States, 242 F.Supp. 1016 (S.D.Miss., 1965) that "consistency of administrative rulings is essential", at 1021, we readily distinguish the Lang case from the instant one. The Lang application was an effort to establish a carrier in addition to the authority held by Navajo along the route in issue. Although Navajo did not oppose the application of Lang, no showing was made that Navajo's service was dormant. In reference to Navajo's service the joint board stated,

One complete operating authority duplicating that being sought here appears to be in existence and unused at the present time. Rather than adding materially to the transportation inventory in the area, it would appear that the grant of additional authority could likely further deteriorate the services and facilities now in existence.

It is evident from the Commission's order in the Lang application that a principal reason for declining the request was that there was an existing carrier authorization already serving the points in issue and that the service being provided the public was "reasonable". It can not be said that the Commission's action in the instant case was an arbitrary disregard of its decision in the Lang case.

The orders of the Commission granting the applications in both cases are affirmed.